No. 75,219

STATE OF KANSAS, *Appellee,* v. KIM R. ORDWAY, *Appellant.*
934 P.2d 94

Opinion filed
March 7, 1997.

*Mary Curtis*, special appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant.

*Leonard J. Dix*, county attorney, argued the cause, and *Carla J. Stovall*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: Kim Ordway asserted an insanity defense to charges of first-degree murder and theft in the deaths of his parents and the theft of their automobile. The jury found him guilty of two counts of second-degree murder and one count of felony theft. Ordway appeals his convictions.

Betty and Clarence Ordway lived approximately a mile west of Stockton, Kansas. On Saturday evening, November 20, 1993, in response to a call from the Ordways' nieces, a sheriff's officer went to the Ordway house. Investigation disclosed drag marks leading to the garage where the officer found Clarence Ordway's body wrapped in bedding and partially concealed behind some garbage cans. After other officers arrived, they forced their way into the locked house to check on Betty Ordway. The house appeared to be very clean and neat. There was a dog in one of the bedrooms, but Mrs. Ordway was not found. Some items seized from the house—a book of daily devotions and a pill container with a compartment for each day of the week—indicated that the household routine had been interrupted on Thursday, November 18.

Clarence Ordway died as a result of being shot in the back with a shotgun. The entry wound was about 6 inches below the base of the neck and 2 inches to the left of the spine. There was no exit wound. Clarence Ordway's left lung and heart were extensively damaged. There was no evidence of defensive injuries to his hands or feet. The date of death was estimated to be November 18, 1993.

A thorough search of the house revealed blood spatters, sometimes combined with what appeared to be tissue or fat, in a number of different locations. One area of the carpet in the television room was "roughed up" as if it had been cleaned, and one of the officers reported a smell in the house that he associated with "cleaning fluid and decomposition." A broken lamp was found in the basement. There did not appear to have been an effort made to clean

a blood smear on the front porch steps and across the floor of the garage.

Law enforcement officials in Kenmore, New York, where Kim Ordway's ex-wife, Suzanne, lived, were advised that Ordway was wanted for questioning in connection with the homicide in Kansas. On November 22, a New York police officer saw a man sitting in a white Chevrolet with a Kansas license plate, which was parked in front of Ordway's wife's house. Ordway gave the officer his correct name and stated in response to a question about weapons that there was a shotgun on the front passenger seat. He complied fully with instructions on getting out of the car and being frisked and handcuffed, and stated that he understood his rights as a suspect. "He was very calm, very passive." When an officer told him they had been looking for his mother, Ordway said, "[M]y mom is in the trunk." A loaded shotgun with the safety off was found under a blanket on the front passenger seat, and a serrated kitchen knife was found under the driver's seat of the car. The back seat was filled with clothes; household items, including some utensils; and toys, some in boxes as if new. Clarence Ordway's wallet and two rings were found in a backpack in the back seat. Betty Ordway's body, wrapped in a tarp and a rug or blanket, was found in the trunk of the Chevrolet.

Betty Ordway also died as a result of shotgun wounds. The pathologist estimated that Betty Ordway died approximately 3 to 4 days before the autopsy was performed on November 23, 1993. She had two shotgun wounds in her right chest and one entry wound in her back, which caused damage to her lungs, heart, liver, ribs, vertebrae, and aorta. In addition to the shotgun wounds, the pathologist found bruises, lacerations, abrasions, and fractures caused by impact with a blunt object. There were bruising and swelling around the left eyebrow; five lacerations on her head; bruising, swelling, and abrasion of the left forearm; and broken bones in both forearms. The pathologist's opinion was that the injuries to her forearms were defensive wounds and that the other trauma injuries also were inflicted prior to her death.

One of the officers who arrested Ordway testified that Ordway's passivity was unusual. Ordway made various statements to the of-

ficer, including the following: "This is a crazy world, especially about mom and dad. . . . This whole thing with mom and dad is crazy." When the officer asked Ordway what was crazy, he responded, "Life." He told the officer that the car belonged to one or both of his parents and that he had been taking Xanax, which was his mother's. Xanax is usually prescribed as an anti-anxiety medication. In response to the officer's questions, Ordway said that he killed his mother and put her in the trunk, and that he left Kansas on Saturday and had been living with her in the car since then. When asked if he wanted to telephone his father in Kansas, Ordway declined, saying, "No, he won't answer." Ordway remained passive until he was being taken from his cell for arraignment, when he rushed at and struggled with four officers.

Ordway was admitted to Larned State Security Hospital on December 8, 1994, when he was 33 years old. The Larned forensic staff's report describes how relatives of the deceased asked a sheriff's officer to accompany them to the Ordways' house, where Clarence Ordway's body was found. The report continues:

> "The relatives informed the officer that the Ordway's son, Kim, had been living with his parents for approximately three to four weeks. They noted that he had been 'extremely depressed and would spend a whole week in his room alone.' They also advised that Mr. Ordway had battered his ex-wife who still lived in New York. In addition, they reported that Mr. Ordway had hit his father in the past and 'had been arrested for it.'"

At the forensic staff conference on Ordway, the social worker reported that the defendant had given inconsistent information at various times and was not reliable. According to a report prepared in 1988, when Ordway was 27, his "occupational functioning had been 'disrupted by heavy alcohol abuse for a number of years.'" He had four DUI convictions. He reportedly had abused PCP, LSD, peyote, psilocybin mushrooms, cocaine, and amphetamines. The report contains the following psychiatric history:

> "Mr. Ordway has had contact with mental health professionals throughout much of his adolescent and adult life. Because of his involvement in burglaries while in his adolescence, Mr. Ordway was placed in a facility called Berkshire Farms. Although the patient's adjustment had only been marginal for several years, his functioning deteriorated even further after the death of his brother in 1984. It

was at this point in his life that the patient's involvement with drugs and alcohol increased. In apparent association with his drug and alcohol involvement, the patient physically assaulted his wife on several occasions. Apparently, it was during this time period that Mr. Ordway developed the delusional and paranoid beliefs that his wife was having affairs with other men and that she had been sexually molested by police officers. In 1985 he was reportedly receiving outpatient counseling at the Mid-Area Mental Health Center in Buffalo, New York, apparently in connection with his second arrest for driving while intoxicated. After attempting to enter Canada with a shotgun in January of 1988, he was referred for psychiatric evaluation. Subsequently, he was hospitalized at the Erie County Mental Health Center in Buffalo, New York, from January 9, 1988 until March 11, 1988. He was given the psychiatric diagnosis of Schizophrenia, Paranoid Type, but the diagnosis of (Psychotic) Depression was also considered at that time."

With regard to Ordway's mental condition during his hospitalization at Larned, the report states:

"[S]ince the time of admission, Mr. Ordway has not manifested evidence of delusions, perceptual disturbances, or other psychotic features. [The staff psychiatrist] emphasized that the patient does appear to have a lengthy and well-documented history of chronic depression. He also emphasized the patient's lengthy and well-documented history of alcohol dependence and involvement with other psychoactive substances. He also felt that the patient's lifelong adjustment has reflected antisocial and dependent qualities. Throughout the course of evaluation, the patient has not requested nor required prescribed medication for anxiety, depression, or psychosis."

Ordway was questioned about his condition at the time of the killings:

"When asked whether or not he felt his body was being controlled by outside forces over which he had no control during the time of the crimes, he denied that he was being controlled or influenced to that degree. However, he communicated that he had an intense feeling that his children were in severe danger and that it was because of his parents that they were in danger. When asked whether or not he was experiencing hallucinatory phenomena which controlled or directed him at the time of the crimes, he angrily stated that he had answered that question too many times already.

. . . .

". . . Although his description of himself during the time period in question suggests that he may have been experiencing auditory hallucinations which were distorting his perceptions of reality, it does not appear that he was unable to differentiate the difference between right and wrong in reference to the crimes he is charged with having committed. His description of himself prior to the time

of the crimes suggests that he may have been feeling depressed; however, it does not appear that he was experiencing vegetative symptoms of depression."

The forensic staff agreed that the psychiatric diagnoses that best described Ordway were "Dysthymia, Secondary Type, Late Onset; Alcohol Dependence; Polysubstance Abuse; and Personality Disorder Not Otherwise Specified (Antisocial and Dependent)." The staff report concludes:

"[I]t was the opinion of staff that Mr. Ordway has experienced a chronic, non-psychotic depression for many years. Prior to the time of the crimes, he may have experienced symptoms of a psychosis (major depression including hallucinations and/or delusions) which impaired his ability to know the nature and quality of his acts. However, in view of the patient's enduring pattern of maladaptive behavior, including a history of aggressive/impulsive behaviors and substance abuse, it was felt that Mr. Ordway's personality dynamics are such that he could commit senseless and violent crimes without experiencing hallucinatory phenomena. Consequently, after extensive discussion, the staff concluded that they were unable to form a reasonably reliable opinion about Mr. Ordway's legal sanity on or around November 18, 1993."

The Larned report states that a psychiatric evaluation which had been prepared by Dr. William Logan was signed by the psychiatrist on November 29, 1994. Dr. Logan testified at trial that he had interviewed and evaluated the defendant. The family history Dr. Logan compiled for Ordway showed that Ordway's maternal grandmother was institutionalized for decades due to severe schizophrenia. According to Dr. Logan, the tendency to develop schizophrenia is genetic so that persons with close relatives who have manifested schizophrenia may be expected to have a higher than usual incidence of the condition. Ordway's history included hyperactivity as a child and a head injury at the age of 16. Of particular significance, according to Dr. Logan, was an automobile accident on November 22, 1984, in which Ordway was severely injured and his younger brother was killed. Ordway was driving, and he was intoxicated. Ordway became severely depressed and began using drugs and alcohol heavily. Dr. Logan noted that Ordway subsequently had suffered renewed depressions which coincided with the anniversary of his brother's death in November. Ordway killed his parents in November 1993.

Dr. Logan testified that in late 1987 to early 1988, Ordway had a psychotic episode which resulted in his being hospitalized, where he was diagnosed as schizophrenic. Joseph Liebergall, a forensic psychologist who directs the Erie County [New York] Forensic Mental Health Center, testified at trial and furnished more information about Ordway's diagnosis and treatment in 1988. Dr. Liebergall's agency referred Ordway to two of its consulting psychiatrists. Ordway's treatment team at the hospital was headed by one of the psychiatrists, Dr. Block. The treatment team's diagnosis was paranoid schizophrenia. Dr. Liebergall thought that Ordway "suffered from a depression with psychotic features." Dr. Liebergall testified that his diagnosis differed from the hospital team's diagnosis but that the two were not exclusive of one another. In fact, when the features of the two illnesses combine in an individual, the condition is called schizoaffective disorder. Among the characteristics Dr. Liebergall noted about Ordway in early 1988 were depression and a great deal of rage. Ordway harbored bizarre thoughts and fixed false beliefs, in the words of Dr. Liebergall. Ordway believed that the world was coming to an end, that his sons had special powers, and that his wife was sexually involved with the police officers of Tonawanda, the suburb of Buffalo where they lived. He was arrested at the Canadian border with a shotgun, and he said it would be better to shoot bears than people. Dr. Liebergall testified that it was clearly possible for a person who was depressed with psychotic features to lack an understanding of the nature and quality of his acts and that they are wrong. When Ordway was medicated with Thorazine, he improved significantly.

According to the testimony of Dr. Logan, in 1992 Ordway again became depressed. He and his wife separated, and he was arrested a fourth time for DUI. After spending some time in California, he arrived in Stockton, Kansas, to spend the summer with his parents. His sons came from New York to be with him for the first part of the summer. After his children left, Ordway began to sink into depression and develop "odd thinking about them." In October, he decided to go to New York to check on them, but on an impulse he went to Denver instead. There he began to hear voices. He was robbed; he stayed at the bus station for awhile, then he called his

parents, who drove to Denver to get him to go back home with them. Back in Stockton, Ordway's depression worsened and his thoughts became bizarre and persecutory. He developed the idea that his parents either would kill his children or would have someone else kill them. People who came into contact with Ordway at this time described his behavior as weird, odd, brooding, and preoccupied. Dr. Logan thought it was significant that Ordway's mother had told her sister she was afraid of him. Confirmed reports from a number of sources showed that Ordway isolated himself in his room for at least 7 to 9 days before killing his parents. He said that he was confused and was trying to understand what the voices were telling him. During the late afternoon of November 18, Ordway was overcome with a feeling of panic, and he heard his sons' voices crying that they needed to be saved. He had the idea that he would go to hell if he did not save his children, and voices were telling him he needed to kill his parents.

Ordway told Dr. Logan that shortly after he killed his parents, the voices and bizarre thoughts subsided. Confused, Ordway decided to go to New York to check on his sons. Dr. Logan testified that it was not uncommon for delusional and rational thoughts to coexist in people with severe mental illness. Dr. Logan believed that in the internal struggle between Ordway's delusional and rational thoughts, the rational thoughts began to prevail shortly after he killed his parents. Thus, Dr. Logan concluded that, without any realization that it was wrong, Ordway killed his parents in response to the voices, but that he soon began to question whether what he had done was right.

Dr. Logan's opinion was that Ordway was legally insane when he killed his parents. Asked for his opinion to a reasonable medical certainty about Ordway's condition at the time of the killings, Dr. Logan stated:

"I believe as I said before that he was suffering from a major depressive reaction with psychotic features, principally the delusional idea that his parents were hurting his children and auditory hallucinations of his children yelling for him to save them, and also the idea that if [he] did not act, he would be condemned to hell. I believe that these ideas were what guided his behavior at the time to the extent that he did not know what he was doing in any kind of rational way."

We first consider Ordway's argument that the jury should have been instructed on voluntary manslaughter as a lesser included offense. Ordway was charged with two counts of first-degree murder. The jury was instructed on the elements of first- and second-degree murder with respect to each count. Defendant's counsel requested that the jury be instructed on voluntary manslaughter, and the district court refused.

The trial court has an affirmative duty to instruct on all lesser included offenses established by the evidence, even if it is weak and inconclusive. *State v. Gadelkarim*, 256 Kan. 671, 694, 887 P.2d 88 (1994). Ordway contends that a voluntary manslaughter instruction was required in this case because the evidence showed that he killed his parents without malice and for the purpose of preventing them from harming his children.

Voluntary manslaughter is defined in K.S.A. 21-3403: "Voluntary manslaughter is the intentional killing of a human being committed: (a) Upon a sudden quarrel or in the heat of passion; or (b) upon an unreasonable but honest belief that circumstances existed that justified deadly force under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto." K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." There is no contention that either K.S.A. 21-3212 or K.S.A. 21-3213 is applicable in the present circumstances.

Ordway principally relies on subsection (a) of the voluntary manslaughter statute. It is his contention that his intentional killing of his parents was committed in the heat of passion within the meaning of the statute.

Ordway concedes that up until now cases interpreting the statute apply an objective test in determining whether the provocation was sufficient to kindle heat of passion, within the meaning of the statute. In *State v. Cheeks*, 258 Kan. 581, Syl. ¶ 7, 908 P.2d 175 (1995), the court stated:

"The key elements of voluntary manslaughter are whether the killing was intentional and whether there was legally sufficient provocation. K.S.A. 21-3403.

Whether a provocation is legally sufficient is an objective, rather than a subjective, determination. To be legally sufficient to intentionally kill an individual, a provocation must consist of more than mere words or gestures, and if assault or battery is involved the defendant must have a reasonable belief that he or she is in danger of great bodily harm or at risk of death. A provocation is legally sufficient if it is calculated to deprive a reasonable person of self-control and to cause the person to act out of passion rather than reason."

Ordway wants the court to consider the possibility that a subjective standard should be applied in some circumstances. He suggests that the key lies in defining heat of passion to include a state of extreme distress caused by delusions. We find no merit in the suggestion.

Ordway argues that the legislature's removing the element of malice from the version of the voluntary manslaughter statute that became effective in 1992 "permits the court to recognize a different form of manslaughter, in order to allow conviction of mentally ill criminal defendants of a homicide committed without premeditation or malice."

Contrary to Ordway's premise, the phrase "without malice" was included in the statute before the 1992 revision. In 1992, the phrase "without malice" was removed when the element of malice was removed from the statutory definitions of first- and second-degree murder. L. 1992, ch. 298, §§ 3, 4. Hence, the pre-1992 presence of "without malice" in the voluntary manslaughter statute served to contrast it with the statutory definitions of first- and second-degree murder. With elimination of malice in the murder statutes, the phrase "without malice" no longer served a purpose in the voluntary manslaughter statute and was removed. The language change did not affect the substance of 21-3403. Malice was not an element of voluntary manslaughter either before or after the 1992 amendment. Here are the changes which were made in the statute:

"Sec. 5. K.S.A. 21-3403 is hereby amended to read as follows: 21-3403. Voluntary manslaughter is the ~~unlawful~~ *intentional* killing of a human being; ~~without malice, which is done intentionally upon a sudden quarrel or in the heat of passion~~ *committed:*

*(a) Upon a sudden quarrel or in the heat of passion; or*

*(b) upon an unreasonable but honest belief that deadly force was justified in self-defense.*

"Voluntary manslaughter is a class C felony." L. 1992, ch. 298, 5.

In 1993, subsection (b) was amended as follows: "Voluntary manslaughter is the intentional killing of a human being ·committed . . . upon an unreasonable but honest belief that *circumstances existed that justified* deadly force ~~was justified in self defense~~ *under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto.*" L. 1993, ch. 291, 20. The elimination of the element of malice from the statute, according to Ordway, broadened the category of voluntary manslaughter so that it could "include intentional killing by a mentally ill defendant . . . whether or not their beliefs are founded in reality." We do not agree.

Ordway further argues that a voluntary manslaughter instruction should have been given because the evidence showed that he killed his parents upon an unreasonable but honest belief that circumstances existed that justified the use of deadly force against them in the defense of his children. K.S.A. 21-3211 provides: "A person is justified in the use of force against an aggressor when and to the extent it appears to him and he reasonably believes that such conduct is necessary to defend himself or another against such aggressor's imminent use of unlawful force." In this case, there was evidence to the effect that it appeared to Ordway that his use of force against his parents was necessary to defend his children from unlawful force being used against them by his parents. There is no evidence or even contention that his belief was reasonable.

K.S.A. 21-3403(b) defines voluntary manslaughter as an intentional killing upon an unreasonable but honest belief that circumstances existed that justified deadly force under 21-3211. K.S.A. 21-3211 provides that the circumstances justify the use of force when a defendant reasonably believes that its use is necessary to defend others. When the two statutes are read together, the unreasonable belief element of 21-3403 must be reconciled with the reasonable belief element of 21-3211. It seems that this may be accomplished by a plain reading. That is, if the reasonable belief that force was necessary, which is the substance of 21-3211, is substituted for the defense-of-self-or-others as designated in 21-3403(b), the latter provides that voluntary manslaughter is an in-

tentional killing upon a defendant's unreasonable but honest belief that he or she reasonably believed the use of force was necessary to defend others. In other words, the 21-3211 reasonableness of the belief that deadly force was justified is irrelevant because the 21-3403(b) belief is unreasonable. Although Ordway could not qualify for acquittal under the perfect defense of defense of self or others under 21-3211, the reasonableness element of 21-3211 should not prevent a trial court's giving an instruction on the lesser included offense of voluntary manslaughter.

With regard to a defense-of-others instruction, this court has stated that the evidence must support affirmative findings by a rational factfinder to the subjective question whether defendant honestly believed his action was necessary to defend others as well as to the objective question whether his belief was reasonable. *State v. Rutter*, 252 Kan. 739, 746, 850 P.2d 899 (1993). In a case such as the present one, however, where the defendant is seeking an instruction on the lesser included offense of voluntary manslaughter rather than asserting the affirmative defense of defense of others, the objective component of defense of others should be immaterial. Both elements in the offense of voluntary manslaughter as defined in 21-3403(b) are subjective. The defendant's belief must be sincerely held, and it must be unreasonable. *State v. Jones*, 257 Kan. 856, 873, 896 P.2d 1077 (1995). For this reason, the "objective elements" of 21-3211—an aggressor, imminence, and unlawful force—would not come in for consideration.

Legislative history of K.S.A. 21-3403 shows that the definition of voluntary manslaughter was expanded by the addition of subsection (b) in 1992. L. 1992, ch. 298, § 5. Until then, the statute defined voluntary manslaughter as an intentional killing upon a sudden quarrel or in the heat of passion. Notes on proposed criminal code revisions were attached to the minutes of the Senate Judiciary Committee from March 22, 1992, which contained the following comments about subsection (b) of 21-3403:

"(b) 'Imperfect right to self-defense' manslaughter

"This new subsection covers intentional killings that result from an unreasonable but honest belief that deadly force was justified in self-defense. In essence, the defendant meets the subjective, but not the objective, test for self-defense.

This so-called 'imperfect right to self-defense' is recognized in various forms. Kansas apparently recognizes it for unintentional killings under involuntary manslaughter. *State v. Gregory*, 218 Kan. 180 (1975); *State v. Warren*, 5 Kan. App. 2d 754 (1981) *State v. Meyers*, 245 Kan. 471 (1989). The Model Penal Code also follows this approach. Some states, e.g. Illinois, recognize this partial defense for intentional killings. *See*, LaFave, Criminal Law, pp. 665-666 (1986).

"Applying this partial defense to intentional killings is simply a recognition of the practical realities of plea bargaining and jury verdicts. Often it is unjust to prosecute and convict such killers of murder and it is equally unjust to acquit them. This new subsection provides a middle category that is theoretically sound and legitimizes the realities of plea bargaining and jury verdicts."

There is no express indication in the note to 21-3403(b) that there was any contemplation that the subsection's unreasonable belief might be based on psychotic delusions (or some other form of mental illness). Nor does examination of the Kansas case law cited in the note indicate that application of subsection (b) to cases where a homicide defendant denied criminal responsibility due to mental illness was envisioned.

In Illinois, the offense known as second-degree murder includes the elements of Kansas' voluntary manslaughter offense, K.S.A. 21-3403(b). Ill. Comp. Stat. ch. 720 5/9-2 (1994) provides, in part:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder as defined in paragraphs (1) or (2) of subsection (a) of Section 9-1 of this Code and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill, but he negligently or accidentally causes the death of the individual killed; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.

"(b) Serious provocation is conduct sufficient to excite an intense passion in a reasonable person.

"(c) When a defendant is on trial for first degree murder and evidence of either of the mitigating factors defined in subsection (a) of this Section has been presented, the burden of proof is on the defendant to prove either mitigating factor by a preponderance of the evidence before the defendant can be found guilty of second degree murder. However, the burden of proof remains on the State to prove beyond a reasonable doubt each of the elements of first degree murder and, when appropriately raised, the absence of circumstances at the time of the

killing that would justify or exonerate the killing under the principles stated in Article 7 of this Code."

Article 7 includes the principle of self-defense. Explaining the relation of 5/9-2(a)(2) to self-defense, Illinois courts state that both involve the question whether the defendant subjectively believed at the time of the killing that deadly force was justified, but they differ with respect to the reasonableness of that belief. Where the belief was unreasonable, the offense should be reduced from murder to manslaughter. Where the belief was reasonable, defendant should be acquitted. See, *e.g.*, *People v. O'Neal*, 104 Ill. 2d 399, 472 N.E.2d 441 (1984). In other words, 5/9-2(a)(2) functions as an imperfect form of self-defense.

The Illinois intermediate appellate court considered the "unreasonable but honest belief" mitigation provision of the statute in *People v. Aliwoli*, 238 Ill. App. 3d 602, 606 N.E.2d 347, *app. denied* 148 Ill. 2d 644 (1992). The defendant in that case was charged with attempted first-degree murder of three police officers when he shot and wounded them trying to avoid being stopped for a traffic violation. Defense counsel asserted an insanity defense, but defendant testified that he acted in self-defense. The appellate court affirmed the trial court's refusing to give an instruction on second-degree murder for several reasons. One reason was that Illinois does not recognize an attempted second-degree murder offense. Another was that the court found

"no evidence of mitigation in the case at bar that justifies the giving of the instruction even if the crime of attempted second degree murder existed in Illinois. Defendant failed to validly prove a sudden and intense passion or that he was seriously provoked by the officers' routine stop for passing a school bus. The evidence adduced at trial was that defendant was either insane or that he had a longstanding mental illness, neither of which is a mitigating factor under the statute. (Ill. Rev. Stat. 1987, ch. 38, pars. 9-2(a)(1), (a)(2).) An unproved insanity defense was not intended to be a mitigating factor in the crime of second degree murder. (See *People v. Pecina* (1985), 132 Ill. App. 3d 948, 954, 477 N.E.2d 811 (where the court rejected defendant's instruction on voluntary manslaughter even though there was evidence that tended to support the defenses of insanity and voluntary intoxication).) The predatory conduct of the defendant in searching out his victims would negate the notion of self-defense." 238 Ill. App. 3d at 620-21.

We conclude that K.S.A. 21-3403(b) has no application where a defendant raises the defense of insanity, and more specifically, the "unreasonable but honest belief" necessary to support the "imperfect right to self-defense manslaughter" cannot be based upon a psychotic delusion.

Ordway next argues that the jury should have been instructed on the disposition of defendant if he were found not guilty by reason of insanity. Ordway requested the following instruction on the effect of a verdict of not guilty because of insanity:

> "A person found not guilty because of insanity is committed to the State Security Hospital for safe-keeping and treatment until it is found by this Court, after the Rooks County Attorney has had the opportunity to present all relevant evidence, that he is no longer mentally ill or a threat to himself or others."

The trial judge refused to give the requested instruction on the ground that it called too much attention to a matter which lay outside the jury's domain. Instead, he gave PIK Crim. 3d 54.10-A, modified by the addition of the italicized words: "A person found not guilty because of insanity is committed to the State Security Hospital for safe-keeping and treatment *unless and* until discharged according to law." Defense counsel objected that the pattern instruction, even modified, does not inform the jury that defendant could remain hospitalized for a prolonged period, even for life.

Ordway also complains about the trial court's response to a question posed by the jury during its deliberations. The presiding juror submitted the following written question: "To Judge Bouker, re: Instruction No. 13. Is the jury entitled to receive any additional information relative to safekeeping, treatment, and discharge?" Defense counsel suggested giving his requested instruction on the effect of a verdict of not guilty because of insanity. Over defendant's objection, the trial court gave the following response:

> "The issue that your question involves is the sanity of Mr. Ordway at the time of the incidents specified in the complaint. What happens to Mr. Ordway after this trial has nothing to do with deciding the question of sanity. You must not speculate further on what may happen after this trial but must confine yourselves strictly to the instructions given by the Court and the evidence you have heard."

The standard for this court's review of the trial court's instructions is well established: "If jury instructions properly and fairly state the law as applied to the facts in the case when considered as a whole and if the jury could not reasonably be misled by them, the instructions should be approved on appeal." *State v. Butler*, 257 Kan. 1043, Syl. ¶ 10, 897 P.2d 1007 (1995). As to the trial court's response to a jury's mid-deliberation question, K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where the information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

Ordway contends:

"[T]he error consists of allowing the jury to remain confused. Because the jury clearly debated the question whether to find Kim Ordway not guilty by reason of insanity, but were concerned about the consequences of such a verdict, it was error for the court not to clear up the confusion. Without giving more explanation to the jury under the circumstances the trial court created the very 'fear of the prompt release' that prompted the development of the rule that the court may tell the jury something about the release procedures, and prevented the defendant from receiving fair consideration of his evidence of insanity. [*State v.*] *Blake*, [209 Kan. 196, 495 P.2d 905 (1972)]."

In *State v. Hamilton*, 216 Kan. 559, 534 P.2d 226 (1975), the claimed error was that the trial court instructed the jury as to the legal consequence of a verdict of not guilty by reason of insanity. This court noted that K.S.A. 22-3428(3) mandated that the trial court so instruct the jury, and said:

"We have not spoken definitively on the effect of 22-3428(3), although in *State v. Blake*, 209 Kan. 196, 207, 495 P.2d 905, we said that to include the verbatim text of former K.S.A. 62-1532 in the instructions was prejudicially erroneous when combined with the trial judge's cross-questioning of a defense witness. In the *Blake* opinion we carefully refrained from passing judgment on the impact of 22-3428, previously adopted by not yet in effect. We did not mean to suggest that an instruction on the substance of 22-3428, standing alone, would be clearly erroneous.

"However, we did have this to say in *Blake* on the subject of prejudice: that an instruction on the substance of the statute could 'no doubt be a two-edged sword.

In some cases it may assure a reluctant jury that their acquittal of an "insane" defendant will not immediately "put him on the bricks." In others it may achieve the result we perceive here, warning the jury that such a result may be achieved all too soon.'

"In our opinion, the view which was expressed in *Lyles v. United States*, 254 F.2d 725 (D.C.), reflects a rational view of the fitness of this instruction where sanity has been placed in issue. . . .

. . . .

" 'This point arises under the doctrine, well established and sound, that the jury has no concern with the consequences of a verdict, either in the sentence, if any, or the nature or extent of it, or in probation. But we think that doctrine does not apply in the problem before us. The issue of insanity having been fairly raised, the jury may return one of three verdicts, guilty, not guilty, or not guilty by reason of insanity. Jurors, in common with people in general, are aware of the meanings of verdicts of guilty and not guilty. It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning. As a matter of fact its meaning was not made clear in this jurisdiction until Congress enacted the statute of August 9, 1955. It means neither freedom nor punishment. It means the accused will be confined in a hospital for the mentally ill until the superintendent of such hospital certifies, and the court is satisfied, that such person has recovered his sanity and will not in the reasonable future be dangerous to himself or others. We think the jury has a right to know the meaning of this possible verdict as accurately as it knows by common knowledge the meaning of the other two possible verdicts.' [254 F.2d at 728]." 216 Kan. at 563-64.

## We then concluded:

"While we cannot say instruction sixteen was clearly erroneous as a matter of law, we believe it went further than the legislature had intended. K.S.A. 22-3428(3) (Weeks 1974) does not require that the statute be quoted *verbatim*, only that the jury be instructed as to its *substance*. The statute provides, in part, that a person committed thereunder may be granted convalescent leave or discharge as an 'involuntary patient' after thirty days notice to the county attorney and sheriff. The conditions under which an 'involuntary patient' may be discharged or given convalescent leave and the procedures therefor are not set out in 22-3428; resort must be had to other statutes. (K.S.A. 1974 Supp. 59-2924.) We cannot presume a legislative intent that all the statutory details be incorporated in an instruction to the jury. In the *Lyles* case the court commented that 'a recitation of the statutory procedure in great detail, such as reading the entire section of the statute' might tend to be confusing. It is our opinion the legislature intended only that the jury be apprised that the defendant, if found not guilty because of insanity, would be committed to the state security hospital for safekeeping and treatment until granted discharge or convalescent leave as provided by law. This

seems to us to be the substance of the statute and we believe an instruction to such effect will fulfill the spirit of the law." 216 Kan. at 565.

Here, the trial court gave PIK Crim. 3d 54.10-A, which complies with our opinion in *Hamilton*. Thus, we find no error in the trial court's instruction since it instructed the jury as to the substance of the statute.

Ordway next complains that the prosecutor's comment in opening statement on Ordway's pretrial assertion of his right to counsel was prejudicial error. During his opening statement, the prosecutor described what he expected the evidence to show about Ordway's being taken into custody:

"Officer Dombrowski will testify that he put the defendant in his car and that he gave him his constitutional right [*sic*] under the Miranda decision and that he appeared to understand those rights; that . . . when told that they were concerned about his mother, they were hunting his mother, he advised them that she was in the trunk.

. . . .

"Officer Dombrowski will state that the defendant had presence of mind to ask for an attorney after he was back at the station."

Defense counsel did not interrupt the prosecutor's opening statement to object to the comment on Ordway's exercising his right to counsel. Instead, as soon as the prosecutor finished his opening statement, Ordway's attorney asked for permission to approach the bench. After an off-the-record discussion, the trial judge asked the bailiff to escort the jurors from the courtroom. With the jury away, defense counsel asked that a mistrial be declared: "You can't refer to the defendant's assertion of constitutional rights. His request for counsel is a request for his Fifth Amendment right to remain silent, and it puts an inference of guilt before the jury. . ." Addressing his remarks to the prosecutor, the trial judge refused to grant a mistrial: "Mr. Dix, it's improper to refer to the exercise by a defendant of his constitutional rights. The Court does not believe at this time that it is sufficient to require a mistrial, but the Court strongly cautions Mr. Dix not to reference it in the future." Defense counsel did not ask the trial judge to admonish the jury to disregard the comment. When the jury returned to the courtroom, proceedings resumed without mention of the improper comment.

The State does not contend that the comment was proper. However, in its brief, the State denied improper motive: "The comments by the prosecuting attorney in his opening statement . . . were the product of his mouth out running his brain."

In *State v. Spresser*, 257 Kan. 664, 896 P.2d 1005 (1995), defense counsel broached the subject of punishment during closing argument. During the second part of the State's closing argument, the following exchange took place:

" '[STATE'S ATTORNEY]: . . . [A]nd you are not supposed to consider disposition. So when he [defense counsel] said send anyone to prison, we don't know—that is for the Court to decide. You are not to consider the disposition. *At the same time you may have other victims' lifes [sic] in your hands if we release him.*
" '[DEFENSE COUNSEL]: Objection, Your Honor.
" 'THE COURT: Sustained, disregard the last comment of the prosecutor.' (Emphasis supplied.)" 257 Kan. at 669.

The State conceded that the italicized comment was improper but argued that it was made in response to defense counsel's argument. This court did not agree that provocation was a sound basis for excusing the prosecutor's comment, but it concluded that the trial court's sustaining defendant's immediate objection and instructing the jury to disregard the remark was enough to save the convictions from being reversed on the ground that Spresser had been prejudiced. The court summarized its examination of the case law as follows:

"Although we have recognized there may be remarks that are so prejudicial as to be incurable, neither the briefs of counsel nor our research has disclosed a case where we have held the remark to be incurable. The facts herein do not support declaring the improper remark to be the first incurable remark in our case law." 257 Kan. at 672.

Justice Abbott noted in his concurring opinion, joined by Justices Six and Davis, the difficulty of reversing a case because of the prejudicial remarks of a prosecutor :

"Despite our recognition that a prosecutor's argument to a jury can be so prejudicial as to be incurable, the rule we enforce is that if the defendant does not object to an improper closing argument the error is waived and if the defendant objects and the trial judge instructs the jury to disregard the improper argument the error is cured." 257 Kan. at 674-75.

Defendant's counsel neither made a contemporaneous objection nor asked that the jury be admonished to disregard the prosecutor's improper comment. By various stratagems, he attempts to avoid application of the rule so bluntly expressed in *Spresser*. Ordway argues that it was the responsibility of the trial court to remedy the prosecutor's error by admonishing the jury without being asked to do so. In the case relied on by Ordway, *State v. Ruff*, 252 Kan. 625, 847 P.2d 1258 (1993), the trial court failed to sustain an objection to the prosecutor's telling the jury to send a message by its verdict that the defendant's conduct would not be allowed in "our county." 252 Kan. at 631. This court concluded: "The improper remark by the prosecutor in his summation to the jury would not have provided a basis for reversal of Ruff's conviction if the trial judge, rather than approving the remark after defense counsel objected, had instructed the jury to disregard the remark." 252 Kan. at 636. In the present case, there was no contemporaneous objection for the jury to hear, and the trial judge did not "approve" the prosecutor's comment.

Ordway asserts that defense counsel's failure to interject an immediate objection was a strategic decision. By waiting until the prosecutor finished his opening statement and taking the matter up with the trial court outside the hearing of the jury, defense counsel minimized the emphasis on defendant's exercising his right to counsel. Ordway further asserts that the failure to request an admonition, once his motion for mistrial had been denied, was calculated and served the same purpose. The essence of this argument seems to be that there should be an exception to the *Spresser* rule for defense counsel's exercising trial strategies. Thus, Ordway urges, if the court were to accept that defense counsel's actions were strategic, it accordingly would not equate defendant's failures to interject an immediate objection and request an admonition with waiver. We decline defendant's invitation to make an exception where the failure to object is for strategic purposes.

Another consideration which distinguishes this case from *Spresser* and its forerunners is simply the timing of the errors. Here, the prosecutor's comment was made during his opening statement. In *Spresser*, *Ruff*, and other cases cited, the impropriety occurred dur-

ing closing argument, sometimes as the last words uttered by either party. An improper remark separated by days and volumes of testimony from the jury's deliberations would seem less likely to affect the outcome of the trial than would an improper comment made in closing. Thus, even if the error was neither waived nor cured, in the circumstances of this case the error was harmless.

Ordway next complains on appeal of the admission of evidence that he abused his wife and failed to support his children. Although he states at the outset that the standard of review is abuse of discretion, he concludes that reversal is required because admission of the evidence was not harmless. In a case cited by Ordway, *State v. Dotson*, 256 Kan. 406, 412, 886 P.2d 356 (1994), the court stated: "Appellate review of the admission of prior crimes evidence under K.S.A. 60-455 is limited to whether the trial court abused its discretion or whether the trial court admitted clearly irrelevant evidence." In that case, the court found no reversible error despite concluding that the evidence of the prior crime should not have been admitted. 256 Kan. at 413.

The evidence at issue consists of three excerpts from Suzanne Ordway's testimony. First, she was asked about changes in Ordway when his alcohol and drug use increased after they moved out of her parents' house into their own apartment, and she answered: "Well, he had been violent before that, but on varied occasions this became more frequent." Second, Suzanne was asked whether Ordway had supported his children after she and her husband separated in 1991, and she said, "No." Third, Suzanne was asked when Ordway had accused her of sexual relations with the officers of the Tonawanda Police Department, and she responded: "That was I believe one of the times that he had abused me."

Defense counsel did not interject an objection after any of the questions which elicited the complained-of testimony. Nor did defense counsel ask the trial court to admonish the jury to disregard or limit consideration of the complained-of testimony. After the first complained-of testimony, defense counsel asked the trial court to declare a mistrial. The district court refused the request and directed the prosecutor "not to go into that anymore." Although the prosecutor already had stated that he would save any further

questions for Suzanne Ordway for rebuttal, he then suggested, "I could ask her a question concerning the last time she spoke to the decedents so the jury wouldn't be so aware of what I have been doing." When the jury returned, the prosecutor asked:

"Q. Did you continue to keep in contact with Clarence and Betty Ordway after they moved to Rooks County—
"A. Yes.
"Q. —Kansas[?] What year did you separate from your husband?
"A. 1991.
"Q. Did you continue to keep in contact with him after 1991?
"A. Yes.
"Q. And what type of father was he after 1991?
"A. Oh, he definitely wasn't the same as he was when he was at home.
"Q. Did he support his children?
"A. No."

This last question and answer makes up the second complained-of instance. Defense counsel renewed his motion for mistrial; the trial judge denied it and reminded the prosecutor to refrain from asking questions which might elicit testimony about defendant's prior wrongdoing.

Ordway's argument on appeal seems to assume that the trial court ruled that evidence of his abusing his wife and failing to support his children was admissible under K.S.A. 60-455. The trial court did not authorize admission of the evidence. The trial court denied defense counsel's motions for mistrial, which were made after the prosecutor's questions passed without objection.

As noted in our discussion of the preceding issue, a timely objection is necessary to preserve the issue on appeal. This court's rule is that "erroneous admission of evidence may not be raised on appeal absent a timely objection to the evidence, so stated as to make clear the specific ground of the objection." *State v. Sutton*, 256 Kan. 913, 924, 889 P.2d 755 (1995). A pretrial motion on the subject does not eliminate the requirement:

"If a motion in limine is denied, the moving party must object to the evidence at trial to preserve the issue on appeal. The same rule applies when a trial court reserves its ruling on a motion in limine until trial. The failure to request a ruling on the motion at trial or otherwise object to the evidence at trial results in the

issue not being preserved on appeal." *State v. Johnson*, 255 Kan. 252, Syl. 1, 874 P.2d 623 (1994).

In the present case, defense counsel filed a motion in limine seeking an order precluding the State "from proffering, offering into evidence, mentioning, eliciting, or otherwise referring to or drawing attention to, allegations of, evidence, results, or other indicia of 'Other crimes or civil wrongs' as provided in K.S.A. 60-455." However, his failure to make a timely objection precludes his raising the issue in this appeal.

Ordway next contends that the trial court abused its discretion in admitting the testimony of Kelley Robbins, an expert witness for the State, "concerning her findings" from blood spatter analysis because the second part of the *Frye* test was not satisfied. It appears that appellate counsel for defendant disagrees with his trial counsel, who stated to the trial court during Robbins' testimony, "I think we're over the *Frye* hump, frankly." The gist of the objection at trial was the State's failure to show that a prescribed procedure for blood spatter analysis was followed by the witness, pursuant to *State v. Miller*, 240 Kan. 733, 732 P.2d 756 (1987). In another version of the complaint about admission of Robbins' testimony, appellate counsel asserts that the State "neither qualified Ms. Robbins to testify as an expert in blood spatter identification nor laid a sufficient foundation to show that she conducted the blood spatter testing in conformity with the generally accepted standards in the scientific field."

There is no question about the standard of review.

"The admission or exclusion of evidence, subject to exclusionary rules, is within the trial court's discretion. *State v. Coleman*, 253 Kan. 335, 344, 856 P.2d 121 (1993). Discretion is abused only when judicial action is arbitrary, fanciful, or unreasonable, or when no reasonable person would adopt the trial court's view. *State v. Baker*, 255 Kan. 680, Syl. ¶ 9, 877 P.2d 946 (1994)." *State v. Haddock*, 257 Kan. 964, 978, 897 P.2d 152 (1995).

Long before trial began, defense counsel filed a motion asking the trial court to preclude any testimony interpreting "the origin or meaning of blood spatters." After a hearing at which Robbins testified, the trial court issued a written order. It expressed satisfaction with Robbins' credentials and knowledge of the field, found

that blood spatter analysis is a generally accepted and widely used method in forensic science, and determined that the blood spatter analysis evidence would be helpful to the jury. With regard to defendant's contention, based on the State's not having shown that the analysis in this case had been performed in accordance with the methods generally accepted in the field, the trial court stated:

"The *Miller* Court found that the evidence in that case was properly excluded by the trial **despite** the fact it met the *Frye* test because the witness failed to apply the proper generally accepted procedures. This was the result of application of other evidentiary principles, not the *Frye* test.

"In the present case, if the prosecution cannot show proper application of the accepted method of blood spatter analysis by Ms. Robbins the evidence will not be admitted. However, this is something which will be addressed as it occurs in the trial. This is not part of the *Frye* analysis and was not properly before the Court in the pretrial hearing."

In *Miller*, the KBI laboratory administrator testified about three tests that are used in identifying marijuana. He satisfactorily established that the tests are reliable and are accepted by the scientific community. The arresting officer, Officer Warrington, then testified "as to the manner in which he had performed the tests." 240 Kan. at 735. His testimony showed that the methodology he used deviated from the standard methodology used at the KBI laboratory. The trial court excluded the results of the tests Warrington had performed on the ground that even though the State had laid the necessary foundation to show the reliability of the tests when performed in a prescribed procedure, it failed to show that they had been performed in the prescribed way. 240 Kan. at 736. This court agreed with the trial court's reasoning and result: "[W]e hold that the trial court did not err or abuse its discretion in holding that the evidentiary foundation in this case was insufficient to admit the results of the tests for marijuana made by Officer Warrington." 240 Kan. at 739.

At trial in the present case, defense counsel objected when the State attempted to introduce through Robbins a chart of her blood stain analysis, and a lengthy proffer was made of her testimony. After hearing the witness, the district court excluded a diagram of the house which showed where blood not visible to the unaided

eye had been detected and otherwise permitted her to testify and to use the exhibits she had prepared. With the exception of this diagram, which was excluded as not to scale, not properly oriented with respect to latitude and longitude, and capable of giving the false impression that it represented movement of bodies, the proffer which is outlined here was repeated with the jury present.

Out of the hearing of the jury, Robbins described blood spatter analysis and explained its uses: "Blood stain pattern analysis is the evaluation of the size, shape and distribution of patterns that are identified in blood. The purpose is to possibly identify the activities that took place to deposit the blood, and also possibly to identify the location of the individual during the bloodshed." She continued: "The first step involved is identifying basic patterns. By identifying patterns I can then draw conclusions as far as what type of activity took place to create those patterns. Those are recognizable patterns and they are reproducible patterns." The witness exhibited some pattern standards and linked each with its source. She showed and discussed examples of patterns created by blood dripping from a wound, blood being pumped from an artery, a bloody item coming into contact with a nonbloody item, blood spattered by the force of a bullet, and blood cast off a swinging object. She described the procedure for finding the point of origin for the blood by noting the direction stains point and measuring the width and length of stains. She explained that faint and trace stains can be detected by spraying them with Luminal, a chemical which emits light in reacting with blood. Prefacing her testimony about the purpose to be served by the diagram of the Ordways' house, Robbins stated that she had prepared it and indicated on it in yellow where blood had been detected with Luminal. The diagram was prepared because attempts to capture the emissions of light with still photography and video with a night scope were not successful. The diagram, therefore, represented what she had seen but had been unable to capture with a camera. Robbins stated that there were solid areas of reaction in the foyer and some wipe-type patterns in the entryway into the television room seen with the Luminal which indicated that blood had been cleaned up.

After hearing the witness' testimony about Luminal and its use and acceptability in the field of forensic serology, defense counsel withdrew his *"Frye* objection" to evidence involving the chemical. Defense counsel then stated that his only remaining objection concerned the purpose for which a diagram prepared by Robbins was to be admitted. Because this court adheres to the rule that the erroneous admission of evidence may not be raised on appeal absent a timely and specific objection at trial, see, *e.g., State v. Sutton*, 256 Kan. 913, Syl. 4, that part of appellant's argument which is based on *Frye* is not properly before this court. Thus, what is to be considered here is whether the evidentiary foundation, that is, that Robbins performed the blood spatter analysis in conformance with standard procedure, was sufficient to admit the results of her analysis.

At the time of trial, Robbins had been a forensic scientist in the biology unit of the KBI Crime Laboratory for more than 9 years. She satisfactorily demonstrated proficiency in blood spatter analysis after taking a 40-hour class on the technique and later attended a 3-day refresher course. Her primary duties are in blood stain pattern analysis. Her educational background includes a graduate degree combining administration of justice, investigation, and chemistry. She is nationally certified as a medical laboratory technician, she has been regional vice-president of the International Association for Blood Stain Pattern Analysts, and has been an assistant instructor in blood stain pattern analysis. In other words, Robbins is in the present case what the KBI laboratory administrator was in *Miller*. She is the expert whose testimony establishes that the tests are reliable and are accepted by the scientific community. There is no counterpart to Officer Warrington in this case. The tests which Robbins established were reliable and accepted were performed by her, and she testified that she performed them in the prescribed manner. Nonetheless, defense counsel continued to object on that basis:

"MR. WARREN: I'm going to renew the previous objection. She hasn't met the test of *Max Miller* yet, nor has the State.

"THE COURT: Specify.

"MR. WARREN: She's got to testify that this is consistent with the accepted method in the field, and they've never done that. We've talked about what the KBI says, we've named one guy who does a computer program, and there's been *no evidence that she uses a computer program.* Now, there's another hurdle whether or not with respect to whether she can testify that this is generally accepted in the relevant field whether or not that witness is necessarily competent to testify that she employed the methodology that's generally accepted in the field, *and none of that's been done."*

The objection was overruled.

On appeal, counsel continues to argue that Robbins' qualifications were not established and that the State failed to establish that she followed prescribed procedure. The authorities cited, however, do not support the conclusions advocated by Ordway. We find no abuse has been shown of the trial court's discretion.

Ordway also claims it was an abuse of the trial court's discretion to admit the testimony of the State's expert witness whose report had not been provided to defense counsel prior to trial. "In *United States v. Bagley,* 473 U.S. 667, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985), the Supreme Court decided that due process requires the prosecution to disclose material evidence favorable to the accused." *State v. Humphrey,* 258 Kan. 351, 355, 905 P.2d 664 (1995). Ordway treats this issue as if it were a *Bagley* question involving the prosecution's withholding exculpatory, material evidence.

What actually is at issue is the Larned State Security Hospital's failing to furnish some diagnostic materials along with its report on Ordway's mental condition that was prepared after his evaluation. K.S.A. 22-3219(2) provides, in part:

"A defendant who files a notice of intention to assert the defense that the defendant, as a result of mental disease or defect lacked the mental state required as an element of the offense charged thereby submits and consents to abide by such further orders as the court may make requiring the mental examination of the defendant . . . . A report of each mental examination of the defendant shall be filed in the court and copies thereof shall be supplied to the defendant and the prosecuting attorney."

In the present case, Ordway filed a notice of intention to assert the defense of insanity and was examined at Larned State Security Hospital and by Dr. Logan. It appears that the report the statute

requires to be provided to defense counsel was so provided. Some underlying materials were at issue. Defense counsel stated that he had received "one summarized record relied upon by a couple of masters in social work," but what he wanted were "milieu notes," progress notes, observation reports, and discharge summary. The prosecuting attorney conceded that defense counsel was entitled to the discovery. He also reported that his request for the materials had not been met due to other demands on the psychologist's time. The district court stated that it would sign an order requiring the materials to be delivered on or before March 1. The order does not seem to be in the record on appeal.

On March 8, 1995, trial began. On the fourth day of trial, Monday, March 13, 1995, defense counsel requested the trial court "to exclude any testimony from the Larned State Hospital." He stated in support of the motion: "They still haven't turned over the results of quantitative testing that they administered to Mr. Ordway. . . . There's a Minnesota Multiphasic Personality Inventory that was administered, and there's Millon Clinical Profile Part II, that they refer to in their notes, it appears to form part of Mr. Huerter's diagnosis." The prosecuting attorney responded that the staff at Larned State Security Hospital had supplied documents pertinent to the evaluation, and defense counsel agreed that the prosecutor forwarded those materials to him. The prosecutor suggested that if specific materials were missing, he should be given the opportunity to contact the hospital and "get that rectified today, immediately." The trial court told the prosecutor to telephone the state hospital for an explanation and to communicate that "I'm at a point where I'm going to want somebody here personally explaining to me while [sic] the most obvious material that I ordered provided was not provided." The prosecutor was told to report back the same day. In his brief, Ordway states: "Some additional materials were provided that same day by fax to the prosecuting attorney's office, but defendant did not remove his objection to the testimony of the witness." There does not seem to be a record reference in appellant's brief, however, to any subsequent defense objection to admission of the testimony of state hospital personnel.

It appears safe to assume that the materials specified by defense counsel were provided—they are not mentioned again.

To accommodate a witness' schedule, court did not convene on Tuesday, March 14. On Thursday, March 16, Dr. Arsenio Imperial, a psychiatrist, and Dr. Robert Huerter, a psychologist, both on staff at Larned State Security Hospital, testified for the State. It does not appear from the record that defense counsel objected to the testimony of either witness at the time he was called. In other words, this issue, like the last one, appears to have been raised by appellate counsel even though it was resolved at trial and not preserved for appeal. In any event, we find no abuse of discretion has been shown.

Finally, Ordway challenges the sufficiency of the evidence to support his conviction of theft of his parents' automobile. When the sufficiency of the evidence is challenged in a criminal case, "[t]he appellate court looks only to the evidence in favor of the verdict to determine if the essential elements of a charge are sustained. *State v. Patterson*, 243 Kan. 262, Syl. ¶ 1, 755 P.2d 551 (1988)." *State v. Pratt*, 255 Kan. 767, 768, 876 P.2d 1390 (1994).

Ordway contends that the evidence would not even support the lesser offense of deprivation of property. He concedes that the State established that the car was titled to Clarence Ordway and that the defendant did not drive the car as a matter of course. He would have the court reverse his theft conviction because "there was no evidence presented that Kim Ordway intended to permanently deprive Clarence Ordway of the Chevy." His argument does not take into account the inferences that reasonably may be drawn from the evidence. "If an inference is a reasonable one, the jury has the right to make the inference. *State v. Buie*, 223 Kan. 594, 597, 575 P.2d 555 (1978); see *State v. Phillips*, 252 Kan. 937, 939-40, 850 P.2d 877 (1993)." *State v. Sanders*, 258 Kan. 409, 414, 904 P.2d 951 (1995). After killing his parents on November 18, Ordway drove their car to New York, where he was arrested in the car on November 22. His counsel suggests: "Kim may have intended to return the car to Kansas after a brief visit with his children." If that inference is reasonable, the inference that he did not intend to restore the car to his parents' estate is as reasonable. We find the

evidence sufficient to support the jury's finding Ordway guilty, as charged, of theft.

Affirmed.