IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 109,706

STATE OF KANSAS,
*Appellee*,

v.

MATTHEW T. FISHER,
*Appellant*.

SYLLABUS BY THE COURT

1.

It is generally error for the State to impeach a criminal defendant with the defendant's post-*Miranda* silence under *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 91 (1976). The same protections apply to a defendant such as the one in this case, who had some discussion with the police, remained silent as to matters later asserted at trial, but never explicitly invoked his right to remain silent. The error here in this case was harmless, however, in large part because what the defendant did say was otherwise thoroughly impeached.

2.

Although prosecutors must not express personal opinions on the credibility of a defendant, in this case, a single reference to the defendant's version of events as "bull" during the prosecutor's closing argument does not require reversal. The comment qualified as "gross and flagrant" because it violated a longstanding Kansas rule, but it did not appear to be the product of ill will, and the evidence against the defendant was strong.

1

3.

A district court's preliminary instruction to a jury stating that a mistrial attributable to jury misconduct "is a tremendous expense and inconvenience to the parties, the Court, and the taxpayers" is not error.

4.

On the evidence in this case, the district judge erred in failing to instruct the jury *sua sponte* on the lesser included offense of attempted voluntary manslaughter based on imperfect self-defense. But the defendant has demonstrated only a theoretical possibility that the jury could have rendered a different verdict, and a theoretical possibility is inadequate to demonstrate clear error meriting reversal of the defendant's attempted second-degree murder conviction.

5.

A resident of a house has, as a matter of law, "an interest" as that term is used in K.S.A. 2015 Supp. 21-5813(a)(1) in an interior door of that house sufficient to support another's prosecution for criminal damage to that door.

6.

On the full appellate record in this case, the three errors identified in the district court proceedings do not support reversal under the cumulative error doctrine.

7.

In this case, the defendant's claim that his sentence was illegal because of an error in classification of his prior convictions is meritless under *State v. Keel*, 302 Kan. 560, 589, 357 P.3d 251 (2015).

8.

*State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002), defeats a criminal defendant's claim that a district judge may not enhance the defendant's sentence on the basis of his or her prior convictions, unless the existence of those convictions has been proved to a jury beyond a reasonable doubt.

Review of the judgment of the Court of Appeals in an unpublished opinion filed July 25, 2014. Appeal from Lyon District Court; W. LEE FOWLER, judge. Opinion filed April 22, 2016. Judgment of the Court of Appeals affirming the district court is affirmed. Judgment of the district court is affirmed.

*Samuel Schirer*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Jonathon L. Noble*, assistant county attorney, argued the cause, and *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: Defendant Matthew T. Fisher appeals his jury trial convictions of attempted second-degree murder and criminal damage to property, which arose out of a fight with a roommate.

Fisher raises seven issues on appeal: (1) whether the prosecutor ran afoul of *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 91 (1976), during his cross-examination of Fisher; (2) whether the prosecutor committed misconduct during closing argument; (3) whether the district court judge should have instructed the jury on the lesser included offense of attempted voluntary manslaughter; (4) whether the district judge erred by telling the jury at the beginning of the trial that a mistrial attributable to jury misconduct would be a burden on the parties and taxpayers; (5) whether the criminal

3

damage conviction was supported by sufficient evidence; (6) whether cumulative error deprived Fisher of a fair trial; and (7) whether the district judge erred in determining Fisher's criminal history score.

As detailed below, we ultimately reject Fisher's arguments and affirm his convictions and sentence.

FACTUAL AND PROCEDURAL BACKGROUND

At the time of the crimes, Fisher lived with his friend Tim Worthen and Tim's ex-wife, Angelique Worthen (Angel). Tim was the sole owner of the house the three shared. Fisher and Tim spent the day drinking, first at Tim's house and then at bars. After Tim left to pick Angel up from work, Fisher headed home on foot. On the way, he encountered police officers twice, the second time right outside of the house.

As a result of the second police encounter, Fisher became belligerent. He kicked a door open inside the house, damaging the door. Then, while back outside the house, Fisher hit Tim, who then went inside next-door neighbor Corby Stevens' house. Eventually, Fisher and Angel ended up in a physical fight that left Angel with life-threatening injuries. Although Stevens' windows were open, both she and Tim denied hearing the fight between Fisher and Angel. Fisher left the scene in Tim's car, but he wrecked the car within a few blocks of the house.

Responding officers and emergency medical technicians would eventually testify that Fisher kept mentioning Tim's address. They also observed that he was covered in an amount of blood inconsistent with the seriousness of his own injuries. A medical technician would testify that Fisher's wounds appeared to be defensive. Fisher was acting paranoid, refused an IV, and referred to an "assassin." Based on Fisher's behavior and his

4

repeated references to Tim's address, officers requested a welfare check at the house. Meanwhile, Fisher was transported to the hospital.

When officers arrived at the house, they found Angel lying in a large pool of blood. Her injuries were so extensive that one officer initially thought she was dead, and one of the medical technicians would eventually testify that he could not immediately tell whether the victim was a man or a woman. But Angel was able to tell the police that "Matt" had hurt her.

Soon after Fisher arrived at the hospital, he told officers that Angel had attacked him and that he had defended himself. He also expressed concern for Tim's safety and said that he feared Angel and Stevens had kidnapped him. He claimed to have left the house to go to the hospital for help. After receiving *Miranda* warnings, Fisher also admitted to telling Angel he would kill her if she did not reveal Tim's whereabouts.

The next morning, Fisher spoke to a different officer, telling her that he had hit Angel because she would not reveal Tim's location. He did not mention self-defense.

The State charged Fisher with attempted murder in the second degree or, in the alternative, aggravated battery. He also was charged with criminal damage to property because of the door he kicked open inside the house.

At trial, after empaneling the jury, the district judge told jurors about the rules and restrictions governing their service. The judge then stated:

> "Any juror who violates these restrictions, as I've explained to you, jeopardizes the
> fairness of these proceedings and a mistrial could result which would require the entire

process to start over. As you can imagine, a mistrial is a tremendous expense and inconvenience to the parties, the Court, and the taxpayers."

At trial, Angel testified that she could not remember much of what happened on the night of the crimes. Tim testified that he had heard Stevens yell out her window that she would not let Tim leave her house.

During direct examination, Fisher said he could not "really remember" talking to police at different times. Fisher testified that Angel had said she received training in hand-to-hand combat while in the Navy. Fisher also testified that Angel started the fight with him by jumping on his back. He asserted that he acted in self-defense when he struck her, pushed her, and stepped on her chest after she had fallen to the ground. Defense counsel asked Fisher if he "ever [got] the opportunity to explain the details of what happened in context." Fisher responded:

"I had. . . . [S]everal officers had asked me what had happened. . . .  And I was of the frame of mind that, you know, they're not going to believe you because the first officer that asked me that, I remember asking, he replied like he didn't believe me so, you know, it is kind of hard to believe."

During cross-examination, the prosecutor and Fisher engaged in the following exchange:

"PROSECUTOR:  When you were aware that maybe you didn't quite tell the police exactly what happened, did you ever contact police and tell them you needed to talk to give a more definitive statement about what happened . . . that night?

"FISHER:  No.

"PROSECUTOR:  Never said a word about these things until today?

6

"DEFENSE COUNSEL: Your honor, in light of the legal proceedings, I believe that encroaches his Constitutional rights, we would object.

"PROSECUTOR: I made—I know the case law, Judge, there's absolutely no reference made to his status. It was only an inquiry as to whether he elected—

"DISTRICT JUDGE: Overruled, you can ask the question about making contact or not making contact."

During the jury instructions conference, the district judge said he would instruct the jury on attempted second-degree murder, aggravated battery by knowingly causing great bodily harm, and reckless aggravated battery. The judge also intended to give a self-defense instruction. The district judge did not instruct on attempted voluntary manslaughter as a lesser included offense, and Fisher did not object to that omission.

The criminal damage instruction required the State to prove:

"1. [Angel] had an interest in property described as a door;

2. [Fisher] knowingly damaged, destroyed, defaced or substantially impaired the use of property by means other than by fire or explosive;

3. [Fisher] did so without consent of [Angel]."

During closing argument, the prosecutor told the jury,

"And I suggest to you when you look at that evidence what you can see by your common knowledge and experience is that it didn't start [alongside] of that car, and, one, if you believe it's self-defense, it doesn't apply because it's excessive. He had her loosened. He

had her away from him. And then he beats the living hell out of her and kills her—about kills her."

The prosecutor then suggested what had happened on the night of the crimes, focusing on photographs of the scene, the extent of Angel's injuries, and Fisher's testimony that he had hit Angel seven or eight times. He continued:

"The testimony was quite clear. She's lying there motionless. You heard the tape of her trying to say who did it in the hospital.

. . . .

"You can't even tell it's a woman anymore, but he wants you to believe it's self-defense. Whatever triggered it, whatever caused him to decide enough was enough with that woman, he took advantage of that and he beat her and beat her with the intent to kill her. . . [T]here is no way in this world the State will assert to you anything but that he intentionally attempted to kill Angel."

In his closing, Fisher's counsel argued that Angel had started the fight in an attempt to keep Tim's whereabouts hidden from Fisher. He pointed out that Angel had induced Fisher to believe she had hand-to-hand combat training. He said that Fisher was merely concerned for Tim and his own welfare and that the situation got "bad in a hurry." Fisher caused Angel's injuries but had no intent to kill her, only to repel a perceived attack. Fisher's counsel also pointed out that Angel did not own the interior door that had been damaged.

In the rebuttal portion of his closing, the prosecutor stated:

"The State put every bit of evidence it had and most of that came from that man, himself, whether it was in the hospital or his assertion today that it was self-defense. How self-serving. How self-serving.

". . . Well, let's take his theory, it was with an elbow, of course they weren't on his hands. He beat the living heck out of her with his elbow. Pick one. Pick self-defense. His super attack from behind that was going to result in his belief, in imminent death or great bodily harm? Bull . . . Take his version. His self-defense isn't allowed at that point. And one way or the other, that blood's still where it was and all over everywhere and she's still laying there dying. I, in my entire life, . . . never can you say, well, it wasn't an attempted murder because she didn't die. State will continue to assert self-defense isn't worth the response. He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to kill Angel []. He meant to do it."

The prosecutor also said, "[Fisher] wasn't really saying he was going to die. He wanted whoever it was off of . . . him and then he kept beating her. When he realized who it was, he didn't stop."

After the jury returned its guilty verdicts, Fisher was sentenced to a prison term of 247 months. On the criminal damage conviction, the district judge noted that "the evidence was not substantial . . . that the property claimed to be damaged . . . was actually owned by [Angel]."

The Court of Appeals rejected Fisher's appellate challenges, *State v. Fisher*, No. 109,706, 2014 WL 3731928 (Kan. App. 2015) (unpublished opinion), and we granted his petition for review.

9

Fisher first argues that the State's introduction of evidence about his post-*Miranda* silence violated *Doyle v. Ohio*, 426 U.S. 610, 618-19, 96 S. Ct. 2240, 49 L. Ed. 91 (1976).

Review of whether a defendant's constitutional rights, as protected by *Doyle*, were violated "involves a question of law that is reviewed de novo." *State v. Reed*, 300 Kan. 494, 509, 332 P.3d 172 (2014). If we rule that there was *Doyle* error, we must determine whether the error was harmless by examining it in the context of the record as a whole, see *State v. Hernandez*, 284 Kan. 74, 95, 159 P.3d 950 (2007) (each case must be scrutinized in the light of trial record as whole; incidents not viewed in isolation), and by considering how the district judge dealt with the error when it arose. *State v. Ward*, 292 Kan. 541, 569-70, 256 P.3d 801 (2011).

> "[T]he error may be declared harmless where the party benefitting from the error proves beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.,* where there is no reasonable possibility that the error contributed to the verdict." 292 Kan. 541, Syl. ¶ 6.

It is generally impermissible for the State to impeach a defendant with the defendant's post-*Miranda* silence. *Doyle*, 426 U.S. at 619; see also *State v. Hernandez*, 284 Kan. 74, Syl. ¶ 3, 159 P.3d 950 (2007) (applying *Doyle*). A prosecutor may not "imply[] that the defendant had a post-*Miranda*, pretrial obligation to reveal to the police or prosecutor the substance of the defendant's trial testimony." *State v. Kemble*, 291 Kan. 109, 122, 238 P.3d 251 (2010). The same protections apply to the defendant who had "some discussion with the police" but "remain[ed] silent as to matters later asserted at

trial," regardless of whether the defendant expressly invoked his or her right to remain silent. *State v. Clark*, 223 Kan. 83, 89, 574 P.2d 174 (1977).

But the protections of *Doyle* have limits. A defendant's silence before given *Miranda* warnings and his or her statements after given the warnings are fair game. See *Hernandez*, 284 Kan. at 82 (no *Doyle* violation when prosecutor refers to defendant's pre-*Miranda* silence); see also *State v. Drayton*, 285 Kan. 689, 707-08, 175 P.3d 861 (2008) (no *Doyle* violation when prosecutor impeaches defendant's trial testimony through use of a prior inconsistent statement made after *Miranda* warnings given). When considering whether a line of questioning violates *Doyle*, "[t]he determinative question . . . is whether the discussion centered on what was *not* said during the interview (the defendant's right to remain silent) or what *was* said but now called into question (impeachment by way of prior inconsistent statements.)" *Hernandez*, 284 Kan. at 91. And a prosecutor may impeach the defendant on his or her post-arrest silence in exceptional circumstances, such as when a defendant opens the door by suggesting he or she fully cooperated with an investigation by sharing all that was known. *State v. Tully*, 293 Kan. 176, 192-93, 262 P.3d 314 (2014).

In addition, a *Doyle* violation does not make reversal of a conviction automatic. We have upheld convictions when, for example, evidence of a defendant's guilt was overwhelming or such evidence combined with other factors. See, *e.g.*, *Hernandez*, 284 Kan. at 95 (evidence of guilt overwhelming). When we have reversed a conviction based on a *Doyle* violation, the factfinder's assessment of the defendant's credibility has tended to be a central issue at trial. See *State v. Santos-Vega*, 299 Kan. 11, 321 P.3d 1 (2014) (district judge gave no admonition or curative instruction; verdict dependent on whether jury believed victim or defendant); see also *Tully*, 293 Kan. at 194 (district judge took no remedial action; verdict hinged on defendant's credibility); *State v. Kemble*, 291 Kan. at

11

124-25 (outcome dependent on evaluation of defendant's credibility; prosecutor's improper reference to defendant's silence addressed theory of defense).

Turning to this case, Fisher claims the prosecutor violated *Doyle* when he asked Fisher if he "ever contact[ed] police and [told] them [he] needed to talk to give a more definitive statement about what happened . . . that night," and followed with, "Never said a word about these things until today?"

Fisher had never expressly invoked his right to remain silent, and he had provided post-*Miranda* statements to at least three officers while in the hospital, but neither obligated him to volunteer his exculpatory story, and the prosecutor committed a *Doyle* violation by suggesting otherwise to the jury. *Clark*, 223 Kan. at 89; see *Drayton*, 285 Kan. at 707-08. The prosecutor's remarks cannot be fairly categorized as proper comment on Fisher's pre-*Miranda* silence or on inconsistencies between post-*Miranda* statements and Fisher's trial testimony. See *Kemble*, 291 Kan. at 122-23 (statement that defendant never said drunkenness affected memory "until today" impermissibly implied defendant had post-*Miranda*, pretrial duty to reveal his testimony). If the prosecutor intended to impeach by pointing out inconsistencies among Fisher's statements, the prosecutor needed to focus on what Fisher *did* say during police interviews, such as his admission that he hit Angel because she would not tell him where Tim was, instead of focusing on what Fisher *did not* say. See *Hernandez*, 284 Kan. at 91.

Our analysis does not end, however, with a ruling that there was error. We must determine whether the error was harmless.

"Both the United States Supreme Court and this court have emphasized the importance of respecting the protections of *Doyle* because 'every post-arrest silence is insolubly ambiguous.'" *Santos-Vega*, 299 Kan. at 26 (citing *Doyle*, 426 U.S. at 617).

12

Here, it was undisputed that Fisher was the one who caused Angel's severe injuries. But his guilt depended on whether the jury believed his most sympathetic version of events—that Angel had instigated the attack on him and that he was acting in self-defense.

In such a case, a prosecutor can flirt with disaster by alluding to a defendant's post-*Miranda* silence. In this particular case, disaster was avoided because the prosecutor also thoroughly impeached Fisher's credibility by emphasizing the inconsistent content of the communications when Fisher was *not* silent. Any further negative impact on Fisher's credibility arising from the prosecutor's two references to Fisher's selective silence would have been strictly marginal, not enough to have had reasonable possibility of contributing to the verdict. See *Santos-Vega*, 299 Kan. at 27. Fisher is not entitled to reversal of his convictions on the basis of the *Doyle* error alone.

## PROSECUTORIAL MISCONDUCT

Fisher next claims the prosecutor committed misconduct on several occasions during both phases of his closing argument.

We review such claims even when a contemporaneous objection was not made at trial. *State v. Anderson*, 294 Kan. 450, 461, 276 P.3d 200 (2012), *cert. denied* 133 S. Ct. 529 (2012). Our analysis has two steps. First, the court determines whether the prosecutor's comments were outside the wide latitude that the prosecutor is allowed in discussing the evidence. If the comments were improper and constituted misconduct, the appellate court must determine whether the comments prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Roeder*, 300 Kan. 901, 932-33, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). In the second step, we consider three factors:  (1) whether the misconduct was gross and flagrant, (2) whether the misconduct showed ill will on the prosecutor's part, and (3) whether the evidence was of

such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). None of these factors is individually controlling. Before the third factor can ever override the first two factors, we must be able to say that the harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), have been met. *Williams*, 299 Kan. at 540-41. As a practical matter, however, if the constitutional harmless error test is met, the statutory test also will be met. See *State v. Lowrance*, 298 Kan. 274, 282, 312 P.3d 328 (2013) (when State meets constitutional harmlessness test it necessarily also meets lower statutory harmlessness test as well). Under the constitutional test, the party benefitting from the error must demonstrate beyond a reasonable doubt that the error did not affect the outcome of the trial in light of the entire record, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. 299 Kan. at 541.

During closing argument, the prosecutor must confine his or her remarks to matters in evidence. *State v. Carr*, 300 Kan. 1, 249, 331 P.3d 544 (2014). And the prosecutor's comments must "accurately reflect the evidence, accurately state the law, and . . . not [be] intended to inflame the jury's passions or prejudices or divert the jury from its duty to decide the case based on the evidence and controlling law." 300 Kan. at 249. The prosecutor has "'considerable latitude in discussing the evidence and drawing reasonable inferences from that evidence.'" *State v. Tahah*, 302 Kan. 783, 788, 358 P.3d 819 (2015).

Fisher first focuses on what he argues was an expression of the prosecutor's opinion on Fisher's guilt:

"You can't even tell it's a woman anymore, but he wants you to believe it's self-defense. Whatever triggered it, whatever caused him to decide enough was enough with that woman, he took advantage of that and he beat her and beat her with the intent to kill her."

14

And, in rebuttal, the prosecutor said:

"State will continue to assert self-defense isn't worth the response. He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to kill Angel Worthen. He meant to do it."

A prosecutor may not express a personal opinion about the defendant's guilt because "'such expressions of personal opinion are a form of unsworn, unchecked testimony, not commentary on the evidence of the case. [Citation omitted.]'" *State v. Mireles*, 297 Kan. 339, 368, 301 P.3d 677 (2013). But a prosecutor may comment on the weakness of a defense or make a directional statement encouraging the jury to examine evidence of guilt. See *State v. Peppers*, 294 Kan. 377, 399-400, 276 P.3d 148 (2012); *State v. Duong*, 292 Kan. 824, 833, 257 P.3d 309 (2011) (pointing out weaknesses of defense theory not misconduct). "[A]n affirmative statement . . . not couched in terms such as 'it is alleged' or 'the State intends to prove' . . . stated as a fact . . . [is] the equivalent of a personal expression of guilt." *State v. Brown*, 295 Kan. 181, 212, 284 P.3d 977 (2012).

On the first of these two challenged statements, just before the prosecutor remarked on Fisher's intent to kill Angel, he had directed the jury to evidence supporting the State's version of events. The prosecutor had referred to Fisher's size, the first responder's initial impression that Angel was dead, and the amount of blood at the scene. The prosecutor then suggested how the fight may have occurred and concluded: "Whatever triggered it, whatever caused him to decide enough was enough . . . he beat her and beat her with the intent" to kill her. The prosecutor then said that there was "no way in this world the State will assert to you anything but that he intentionally attempted to kill Angel." When we consider this first challenged statement in context, we conclude

15

that it was part of a permissible summary of part of the evidence contradicting Fisher's claim of self-defense and was not error.

Turning to the challenged statement from rebuttal closing, the prosecutor again argued, "He intentionally, for whatever reason, whatever it was that triggered in his mind over his bro, Tim, intentionally was going to kill Angel Worthen. He meant to do it." The State suggests that these comments were proper comment on the incredibility of Fisher's claim of self-defense. Again, when the remarks are considered in context, we see no error. *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) (the context in which prosecutor makes a statement is "all-important").

Fisher next argues that the prosecutor committed misconduct by accusing him of lying. A prosecutor is also forbidden from accusing a defendant of lying. See *State v. Brown*, 300 Kan. 542, 560, 331 P.3d 781 (2014). And

> "[t]he prohibition extends not only to using the word 'lie' but also to its 'derivative.' See *State v. Elnicki*, 279 Kan. 47, 62, 105 P.3d 1222 (2005) (prosecutor called defendant's testimony a 'fabrication,' 'yarn,' 'final yarn,' the yarn spun here,' and four-part yarn'); see also [*State v.*] *Akins*, 298 Kan. [592,] 607, 315 P.3d 868 [2014] (prosecutor asked did the jury 'buy' defendant's story and said his testimony was 'not credible')." *Brown*, 300 Kan. at 560.

During rebuttal closing, the prosecutor said:

> "The State put [on] every bit of evidence it had and most of that came from that man, himself, whether it was in the hospital or his assertion today that somehow it was self-defense. How self-serving. How self-serving.

16

". . . Well, let's take his theory, it was with an elbow, of course they weren't on his hands. He beat the living heck out of her with his elbow. Pick one. Pick self-defense. His super attack from behind that was going to result, in his belief, in imminent death or great bodily harm? Bull."

Although the prosecutor's use of "self-serving" to describe Fisher's testimony qualified was proper comment on inconsistencies in Fisher's testimony, the prosecutor's truncated slang exclamation of "bull" was beyond the wide latitude allowed him in discussing the evidence. There is no mistaking the meaning of the expression; it is the equivalent of calling Fisher a liar. And "a prosecutor's time during closing arguments is better spent discussing the evidentiary strengths of the case at hand, rather than devising different ways to euphemistically accuse a criminal defendant of lying on the witness stand." *Brown*, 300 Kan. at 561.

Fisher also alleges misconduct in the form of remarks designed to inflame the passions of the jury. During the opening portion of the State's closing, the prosecutor said: "[I]f you believe it's self-defense, it doesn't apply because it's excessive. He had her loosened. He had her away from him. And then he beats the living hell out of her and kills her—about kills her." This colloquialism resurfaced in somewhat milder form during rebuttal closing: "He beat the living heck out of her."

A prosecutor may not encourage the jury to decide a case based on a personal interest instead of neutrality or distract the jury from its duty to make decisions based on the evidence and the controlling law. See *State v. Corbett*, 281 Kan. 294, 313, 130 P.3d 1179 (2006). But a prosecutor may use "'picturesque speech' as long as he or she does not refer to facts not disclosed by the evidence." *State v. Crawford*, 300 Kan. 740, 748-49, 334 P.3d 311 (2014).

17

The prosecutor's use of "living hell" and "living heck" certainly made for "vivid descriptions" in his review of the evidence. See *State v. McCaslin*, 291 Kan. 697, 723, 245 P.3d 1030 (2011), *overruled on other grounds in State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014). And Fisher believes they crossed the line to repugnant and unprofessional. We disagree. There was no dispute that Fisher beat Angel almost to death; indeed, she suffered life-threatening injuries and was unrecognizable as a woman, or even alive, when discovered. Although a prosecutor probably would be well advised to avoid expressions during arguments that could offend a juror's moral or religious sensibility, we do not think this prosecutor was trying to distract the jury from deciding the case based on the evidence. Instead, he was emphasizing the severity of the beating and the likelihood that it went far beyond the violence that would have been necessary to effectively repel an attack. See *Carr*, 300 Kan. at 249 ("The wide latitude permitted a prosecutor in discussing the evidence during closing argument in a criminal case includes at least limited room for rhetoric and persuasion, even for eloquence and modest spectacle.").

Having held that there was one instance of prosecutorial misconduct during closing, we move to the question of harmlessness.

First, we consider whether the misconduct was gross and flagrant. "Comments generally amount to gross and flagrant misconduct when they were repeated, emphasized, calculated, or in violation of well-established laws." *State v. Barber*, 302 Kan. 367, 380, 353 P.3d 1108 (2015). The prosecutor's use of the word "bull" to describe Fisher's story at trial violated our longstanding rule against a prosecutor's personal commentary on witness credibility, and this is fairly described as gross and flagrant. See *Brown*, 300 Kan. at 561.

18

Next, "[i]n analyzing ill will, this court considers whether the comments were 'deliberate or in apparent indifference to a court's ruling.'" *Barber*, 302 Kan. at 380. There was no specific court ruling in this case that the prosecutor violated, and we do not perceive that the one-time, one-word remark was the product of ill will.

The third factor we consider in determining whether the prosecutor's remark was reversible error, standing alone, is whether the evidence against Fisher was so direct and overwhelming that the misconduct would have had little weight in the minds of jurors. *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). We are convinced that the prosecutor's momentary lapse had negligible, if any impact, on Fisher's jury.

Considering our three harmlessness criteria under the more demanding federal constitutional standard, the State has demonstrated beyond a reasonable doubt that the single error did not affect the outcome of the trial in light of the entire record; there is no reasonable possibility that the brief, unrepeated error contributed to the verdict. See *Williams*, 299 Kan. at 541.

PRELIMINARY INSTRUCTION

Fisher's next argument on this appeal focuses on the district judge's instruction at the start of trial that their misconduct could result in a mistrial, which would be "a tremendous expense and inconvenience to the parties, the Court, and the taxpayers." Fisher, whose counsel did not object below, urges this court to hold that this language was clear error necessitating reversal.

This precise issue was considered in our recent *Tahah* opinion. 302 Kan. at 792-95.

19

In that case, the district judge used nearly identical language at the opening of a trial to warn jurors about the consequences of their misbehavior. 302 Kan. at 792. The defendant challenged the instruction on appeal, suggesting that it violated the rule of *States v. Salts*, 288 Kan. 263, 266-67, 200 P.3d 464 (2009), in which this court held that an *Allen* instruction given at the beginning of deliberations that said "'another trial would be a burden on both sides'" was misleading and inaccurate.

In *Tahah*, we declined to extend the *Salts* holding. We distinguished a preliminary jury instruction given in the context of explaining the danger of juror misconduct from a true *Allen* instruction, which is impermissible because it could coerce jurors into a "unanimous verdict by unduly influencing [them] to compromise their views on the evidence simply to avoid a hung jury." *Tahah*, 302 Kan. at 794-95. We held that the preliminary instruction given in *Tahah* was not error. 302 Kan. at 795. That holding is controlling here, and Fisher's challenge to the preliminary instruction fails.

## LESSER INCLUDED OFFENSE INSTRUCTION

Fisher also challenges the district judge's failure to give a lesser included offense instruction on attempted voluntary manslaughter based on a theory of imperfect self-defense.

Our analysis of jury instruction challenges follows this pattern:

> "'(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the

appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012)'" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

When, as here, the failure to give a lesser included offense instruction is challenged on appeal, the court applies the same analytical framework. *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014).

According to the record before us, Fisher did not seek an instruction on attempted voluntary manslaughter or object to its omission. His silence on this issue at the time of trial does not deprive us of jurisdiction to consider it. See K.S.A. 2015 Supp. 22-3414(3); *State v. Waggoner*, 297 Kan. 94, 97, 298 P.3d 333 (2013) ("[F]ailure to object to an instruction does not prevent appellate review."). But, as further discussed below, it means he would face a higher burden in persuading us that any error merits reversal. See *State v. Williams*, 295 Kan. 506, 511-12, 286 P.3d 195 (2012) (noting exception to K.S.A. 2015 Supp. 22-3414[3]; the preservation requirement allows appellate court to consider clear error).

Turning to whether an attempted voluntary manslaughter instruction would have been legally appropriate, voluntary manslaughter is a lesser included offense of second-degree murder. Therefore, an attempted voluntary manslaughter instruction would have been legally appropriate in this prosecution for attempted second-degree murder. See *State v. Salary*, 301 Kan. 586, 599, 343 P.3d 1165 (2015).

The question of whether the instruction would have been factually appropriate is more difficult. See *State v. Molina*, 299 Kan. 651, 661, 325 P.3d1142 (2014) (failure to instruct on lesser included crime erroneous only if instruction would have been factually appropriate). "'[W]here there is some evidence which would reasonably justify a

21

conviction of some lesser included crime . . . , the judge *shall* instruct the jury as to the crime charged and any lesser included crime.'" *Armstrong*, 299 Kan. at 432 (quoting K.S.A. 2015 Supp. 22-3414[3]); see also *State v. Story*, 300 Kan. 702, 710, 334 P.3d 297 (2014) (evidence must reasonably justify conviction of lesser included crime). If, after a review of all the evidence viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty of the lesser crime, failure to give the instruction is error. *Armstrong*, 299 Kan. at 433.

Voluntary manslaughter based on imperfect self-defense is "knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 2015 Supp. 21-5222." K.S.A. 2015 Supp. 21-5404(a)(2). Under K.S.A. 2015 Supp. 21-5222(a), "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person . . . against such other's imminent use of unlawful force." The imperfection in "imperfect self-defense" is objective unreasonableness of the defendant's subjective belief in the necessity of violence.

This means that, in order to determine that an attempted voluntary manslaughter instruction was factually appropriate, we must detect record evidence to support the existence of Fisher's subjective, honest belief that force was necessary to defend himself against Angel, as well as evidence demonstrating that Fisher's belief was objectively unreasonable. See *State v. Qualls*, 297 Kan. 61, 70-71, 298 P.3d 311 (2013); *State v. Gonzalez*, 282 Kan. 73, 110, 145 P.3d 18 (2006). This court does not speculate about hypothetical scenarios. *Story*, 300 Kan. at 710 (quoting *State v. Wade*, 295 Kan. 916, 925, 287 P.3d 237 [2012]).

This case is relatively unusual. A typical stumbling block for a defendant who desires an instruction on voluntary manslaughter based on imperfect self-defense is a lack of evidence of a subjective belief in the necessity of self-defense. See *Gonzalez*, 282 Kan. at 111-12 (listing cases); see also *State v. Moore*, 287 Kan. 121, 194 P.3d 121 (2008) (voluntary manslaughter instruction not appropriate in shooting death of police officer; defendant knew individuals at door were law enforcement officers, understood why they were there); *State v. White*, 284 Kan. 333, 161 P.3d 208 (2007) (no entitlement to voluntary manslaughter instruction when no evidence defendant believed grandson in imminent danger). Here, we have ample evidence of Fisher's subjective belief. He testified that Angel initiated the attack and that he thought she was going to kill him. He thought Stevens and Angel had harmed Tim and were trying to prevent him from helping Tim. He testified that Angel had told him in the past that she had received training in hand-to-hand combat while in the Navy, and Tim confirmed that Angel had said she could handle herself in a fight.

The greater potential stumbling block in this case is the paucity of evidence that Fisher's subjective belief was objectively unreasonable and yet not delusional. See *State v. Ordway*, 261 Kan. 776, 790, 934 P.2d 94 (1997) (honest but unreasonable belief cannot be product of psychosis). No one saw or heard the beginning of the fight between Fisher and Angel; and Angel's memory of the event was so impaired that she could not contest Fisher's version. Tim did testify that he heard Stevens yell out the window that she would not let him go, which generally supports Fisher's expressed fear for Tim's safety. And one of the first responders testified about Fisher having defensive wounds, which tends to support Fisher's story that Angel, with her military combat training, was on offense at some point in their fight. This evidence reads "reasonable" rather than "unreasonable."

Still, Fisher's version of events also contained elements of the bizarre, including the possibility of government conspiracy and one or more marauding assassins. And

23

Fisher was undoubtedly extremely intoxicated. After being stopped by police twice on his walk home, he fought with Tim on arrival, then promptly forgot he had seen him at all, developing an alternate theory that Tim had been kidnapped and was being confined and concealed against his will by Stevens and Angel.

Even viewing the whole of the evidence in the light most favorable to the prosecutor, we conclude that a rational factfinder could have found Fisher guilty of attempted voluntary manslaughter based on imperfect self-defense. See *Armstrong*, 299 Kan. at 433. Although this is a close case, under current Kansas caselaw, the instruction was factually appropriate.

Having determined the omitted attempted voluntary manslaughter instruction was legally and factually appropriate, we hold there was error under K.S.A. 2015 Supp. 22-3414(3). However, because Fisher lodged no timely objection to the omission of the instruction, he is entitled to reversal only if we hold the omission was clearly erroneous. We consider the entire record de novo, including procedural safeguards and the total amount of inculpatory evidence. *State v. Briseno*, 299 Kan. 877, 886, 326 P.3d 1074 (2014); *Armstrong*, 299 Kan. at 433. We reverse only if firmly convinced that the jury's verdict would have been different had the district judge given the missing instruction, and Fisher bears the burden of demonstrating that this case meets that demanding standard. See *State v. Littlejohn*, 298 Kan. 632, 646, 316 P.3d 136 (2014).

Fisher does not carry his burden here. Under appropriate facts a jury may consider intentional second-degree murder and voluntary manslaughter based on a theory of imperfect self-defense simultaneously. See *State v. Carter*, 284 Kan. 312, 326, 160 P.3d 457 (2007). And, had the jury been properly instructed here, there is a theoretical possibility it could have rendered a different verdict because imperfect self-defense fit some of the admitted evidence. But, a mere theoretical possibility is inadequate under the

clear error standard. The whole of the evidence includes Fisher's admission to hitting Angel and threatening to kill her if she did not reveal Tim's whereabouts. In view of this statement, Fisher cannot show the verdict would have been different if the jury was instructed on attempted voluntary manslaughter.

## SUFFICIENCY OF EVIDENCE OF CRIMINAL DAMAGE

Fisher also challenges the sufficiency of the evidence supporting his conviction for criminal damage to property. When the sufficiency of the evidence is challenged in a criminal case, an appellate court reviews all the evidence in the light most favorable to the State. A conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. *Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). To the extent Fisher's argument requires us to interpret the language of the criminal damage statute, we examine that question of law de novo. *State v. Eddy*, 299 Kan. 29, 32, 321 P.3d 12 (2014).

K.S.A. 2015 Supp. 21-5813(a)(1) defines criminal damage to property as, by means other than fire or explosives, knowingly causing damage to property "in which another has an interest." Fisher specifically argues that insufficient evidence was presented to establish that Angel had "an interest" in the door he damaged. He asks this court to interpret "an interest" as used in the statute to refer to a "property interest," because otherwise an owner of a home could be guilty of criminal damage for kicking in his or her own door as long as another person also had "an interest" in the door. The State suggests that Angel had a leasehold interest in the property.

Black's Law Dictionary 828 (8th ed. 2004) defines "interest" as "a legal share in something; all or part of a legal or equitable claim to or right in property." A "legal interest" is defined as "[a]n interest recognized by law." Black's Law Dictionary 829 (8th

ed. 2004). A "leasehold interest" is "[a] lessor's or lessee's interest under a lease contract." Black's Law Dictionary 910 (8th ed. 2004).

The Court of Appeals has addressed what constitutes "an interest" in property in this context, holding that a pastor who served as an administrator and caretaker for a church had "an interest" in it, that a joint owner could be criminally liable for damage to it, and that both an individual renting a townhome and the entity owning it had "an interest" in it. *In re D.A.*, 40 Kan. App. 2d 878, 882-83, 197 P.3d 849 (2008) (pastor); see *State v. Wilson*, 47 Kan. App. 2d 1, 4-5, 275 P.3d 51 (2008) (joint owner); see also *State v. McGowan*, No. 107,147, 2012 WL 3136771 (Kan. App. 2012) (unpublished opinion) (individual renting, entity owning).

We have not directly addressed this statute, but recently in *State v. Bollinger*, 302 Kan. 309, 313, 352 P.3d 1003 (2015), we considered what constitutes "an interest" under our arson statute. The primary distinction between the criminal damage to property provision and the arson provision is the means by which property is damaged. K.S.A. 2015 Supp. 21-5812, the arson statute, forbids an individual from knowingly by means of fire or explosives damaging a dwelling "in which another person has *any* interest." (Emphasis added.)

We held that when the interest is not contested, the State "is not required to establish exactly what the nature of the 'any interest' is, be it a fee simple, a rental, or a tenancy, in order to satisfy the statutory requirement. [Citation omitted.]" 302 Kan. at 314. But when "the interest is contested at trial, it may be incumbent upon the State to establish the nature" of the interest. *State v. Boone*, 277 Kan. 208, 215, 83 P.3d 195 (2004), *abrogated on other grounds as recognized in State v. De La Torre*, 300 Kan. 591, 601, 331 P.3d 815 (2014). In *Bollinger*, the wife had an interest "derived both from the

26

legal rights inherent in a marital relationship and the special circumstances of this case," including a court order granting her exclusive possession of the house. 302 Kan. at 315.

Other jurisdictions also have considered what type of interest another person must have in property in order to sustain a defendant's conviction for conduct similar to Fisher's and have determined that either a possessory or a proprietary interest in the property is sufficient. See *State v. Brushwood*, 171 S.W.3d 143, 147 (Mo. App. 2005); *People v. Kheyfets*, 174 Misc. 2d 516, 518, 665 N.Y.S.2d 802 (Sup. Ct. 1997).

In this case, the only evidence was that Angel lived at the home containing the damaged door. There was no evidence of a lease or of her payment of rent. Nevertheless, we hold that Angel had "an interest" in Tim's home as one of its residents. The legislature could have been more specific had it wanted to limit the reach of K.S.A. 2015 Supp. 21-5813(a)(1). See *Com. v. One 1988 Suzuki Samurai*, 139 Pa. Commw. 68, 73, 589 A.2d 770 (1991) (possession, exercise of dominion, control over property elements in determining ownership); see also K.S.A. 2015 Supp. 21-5801 (defining theft as taking property from "owner"). Until it says differently, we will include a residential interest such as Angel's among the group covered by "an interest" in the statute.

CUMULATIVE ERROR

Fisher's final appellate challenge to his convictions alleges cumulative error.

> "'Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is

overwhelming. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).'
*State v. Hart*, 297 Kan. 494, 513-14, 301 P.3d 1279 (2013).

"'In a cumulative error analysis, an appellate court aggregates all errors and, even though those errors would individually be considered harmless, analyzes whether their cumulative effect on the outcome of the trial is such that collectively they cannot be determined to be harmless.' *State v. Tully*, 293 Kan. 176, 205, 262 P.3d 314 (2011).

"'In making the assessment of whether the cumulative errors are harmless error, an appellate court examines the errors in the context of the record as a whole considering how the district court dealt with the errors as they arose (including the efficacy, or lack of efficacy, of any remedial efforts); the nature and number of errors committed and their interrelationship, if any; and the strength of the evidence.' 293 Kan. at 205-06.

"'"The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial."' *State v. Magallanez*, 290 Kan. 906, 926, 235 P.3d 460 (2010)." *State v. Smith-Parker*, 301 Kan. 132, 167-68, 340 P.3d 485 (2014).

We have identified three errors: the *Doyle* violation, the prosecutor's reference to Fisher's testimony as "bull," and the failure to instruct on the lesser included offense of attempted voluntary manslaughter. None was reversible standing alone.

Given the evidence against Fisher, particularly including his admission on the night he beat Angel, the permissible impeachment of his more exculpatory trial testimony, and the severity of Angel's injuries, even when the three errors are considered together under the cumulative error doctrine, they do not necessitate reversal. Fisher was not entitled to a perfect trial, and he received a fair one. See *State v. Todd*, 299 Kan. 263, 286-87, 323 P.3d 829 (2014).

Fisher argues his sentence was illegal because of the way in which the district judge classified his prior convictions. Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which the appellate court has unlimited review. *State v. Taylor*, 299 Kan. 5, 8, 319 P.3d 1256 (2014). Appellate courts "unquestionably may entertain" a defendant's claim on an illegal sentence for the first time on appeal because,

> "Kansas courts have 'specific statutory jurisdiction to correct an illegal sentence at any time.' *State v. Scherzer*, 254 Kan. 926, 930, 869 P.2d 729 (1994) (citing K.S.A. 22-3504; see also *State v. Rogers*, 297 Kan. 83, 93, 298 P.3d 325 (2013) ('This court may correct an illegal sentence *sua sponte*.')." *State v. Kelly*, 298 Kan. 965, 975-76, 318 P.3d 987 (2014).

After Fisher had filed his brief before the Court of Appeals, this court issued its opinion in *State v. Murdock*, 299 Kan. 312, 323 P.3d 846 (2014), *modified by Supreme Court order* September 19, 2014, which supported Fisher's claim. Kansas Supreme Court Rule 6.09(b) (2015 Kan. Ct. R. Annot. 54) allows a party to notify the court by letter of additional authority "that has come to the party's attention after the party's last brief was filed." But generally "an appellate court will not consider new issues raised for the first time in a party's Rule 6.09(b) letter," *Littlejohn*, 298 Kan. at 659 (letter raised previously unraised argument, not new argument based on new authority). And the Court of Appeals declined to consider Fisher's challenge to the legality of his sentence. Because Kansas courts are empowered to consider a motion to correct an illegal sentence for the first time on appeal, the panel should have considered the merits of Fisher's issue. See *Kelly*, 298 Kan. at 975-76.

All of this being said, this court has since overruled *Murdock* in *State v. Keel*, 302 Kan. 560, 589, 357 P.3d 251 (2015), and Fisher's illegal sentence claim therefore fails.

SENTENCING BASED ON CRIMINAL HISTORY

Fisher also challenges his sentence under the Sixth and Fourteenth Amendments to the United States Constitution, arguing that the district judge could not use his prior convictions to enhance his sentence without ensuring that the existence of those convictions was proved to a jury beyond a reasonable doubt. Fisher relies on *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Fisher recognizes that this court conclusively rejected this argument in *State v. Ivory*, 273 Kan. 44, 45-48, 41 P.3d 781 (2002), and includes the issue only to preserve it for federal review. No further discussion of the issue is warranted.

CONCLUSION

Defendant Matthew T. Fisher has not persuaded this court that his convictions of attempted second-degree murder and criminal damage to property were infected by reversible error. Nor was his sentence illegal. The judgment of the district court is affirmed.

\* \* \*

ROSEN, J., concurring:  I agree with the majority's well-reasoned conclusions affirming Fisher's conviction and sentence. However, I disagree with the majority opinion which finds the prosecutor's use of the expression "bull" was the equivalent of calling Fisher a liar. While the use of that word can certainly be equated to the characterization ascribed by the majority, as used here, the prosecutor was simply attempting to discredit

30

Fisher's theory of self-defense. In this context, characterizing evidence as "bull" in my mind is synonymous with using words such as "hogwash" or "nonsense" or "ridiculous," terms which merely point to inconsistency in or unbelievability of a person's position. See, *e.g.*, *State v. Perkins*, 271 Conn. 218, 267-68, 856 A.2d 917 (2004), where the prosecutor in closing argument summarized the defendant's theory and then remarked, "Bull." On appeal, the court found that the prosecutor's comment related to inferences that the jurors might draw from the evidence and were not a critique of the credibility of the defendant or other witnesses. See also *People v. Charles*, 58 Mich. App. 371, 388, 227 N.W.2d 348 (1975) (prosecutor's closing argument reference to defendant's "cock-and-bull" story not improper); *State v. Weaver*, 912 S.W.2d 499, 513-14 (Mo. 1995) (prosecutor's characterization of defendant's theory as "cock-and-bull" story acceptable comment on believability of defense position). As a result, I would find the use of the term "bull" as used here was not beyond the wide latitude allowed in discussing the evidence resulting in error in this case.

I also disagree with the majority concluding that the record requires the district court judge to instruct the jury on attempted voluntary manslaughter. As the majority points out, voluntary manslaughter based on imperfect self-defense is "knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 21-5222." K.S.A. 2015 Supp. 21-5404(a)(2). Under K.S.A. 2015 Supp. 21-5222(a), "[a] person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person . . . against such other's imminent use of unlawful force."

K.S.A. 2015 Supp. 22-3414(3) provides "where there is some evidence which would reasonably justify a conviction of some lesser included crime . . . the judge shall instruct the jury as to the crime charged and any such lesser included crime." Here, Fisher

did not seek an instruction on attempted voluntary manslaughter or object to its omission, and only sparse evidence based on the testimony, read from a cold record, of a delusional intoxicated defendant is offered to support it. It bears repeating that the test set forth in K.S.A. 2015 Supp. 22-3414(3) is not a theoretical one. Instead, it requires the trial judge, who has heard, seen, and evaluated all of the evidence in the case, to determine whether there is "some evidence which would *reasonably justify a conviction*" of the lesser included crime. *State v. Haberlein*, 296 Kan. 195, 214, 290 P.3d 640 (2012) (Rosen, concurring in part, dissenting in part), *cert. denied* 134 S. Ct. 148 (2013). What does not bear repeating is any further explanation of my position as it relates to the inclusion of lesser included offenses when little or no actual evidence exists to support the unrequested or requested instruction. I would simply find on this record and consistent with my dissenting opinions in *State v. Qualls*, 297 Kan. 61, 73, 298 P.3d 311 (2013); *Haberlein*, 296 Kan. at 214; *State v. Tahah*, 293 Kan. 267, 280-81, 262 P.3d 1045 (2011); and *State v. Scaife*, 286 Kan. 614, 628-29, 186 P.3d 755 (2008); that the trial court did not err in failing to instruct the jury on the lesser included offense of attempted voluntary manslaughter.

STEGALL, J., joins the foregoing concurring opinion.

* * *

BILES, J., concurring: I concur with the majority except as to the preliminary instruction holding. As explained in *State v. Tahah*, 302 Kan. 783, 797, 358 P.3d 819 (2015) (Johnson, J. concurring), I believe giving that instruction was error. Given that, I would additionally hold this error was harmless under the applicable standard both individually and cumulatively with the other errors determined by the majority.

* * *

JOHNSON, J., dissenting in part: I agree with the majority's identification of three trial errors, *i.e.*, "the *Doyle* violation, the prosecutor's reference to Fisher's testimony as 'bull,' and the failure to instruct on the lesser included offense instruction of attempted voluntary manslaughter." Slip op. at 28. But I take exception to part of the majority's analysis on the question of whether the voluntary manslaughter lesser included offense instruction was factually appropriate, and I find an additional error in giving the pretrial instruction directing the jury to consider matters unrelated to defendant's guilt. Further, I would find that the State did not present substantial competent evidence to support the conviction for criminal damage to property, as the State charged that crime in Fisher's case.

Beginning with the factual propriety of the voluntary manslaughter instruction, I would not apply the product-of-psychosis exception from *State v. Ordway*, 261 Kan. 776, 934 P.2d 94 (1997), instead of our more recent—and arguably more logically consistent—test enunciated in *State v. Roeder*, 300 Kan. 901, 336 P.3d 831 (2014), *cert. denied* 135 S. Ct. 2316 (2015). As we pointed out in *Roeder*, the *Ordway* court first found that the elements of the imperfect self-defense manslaughter statute involved in that case were purely subjective, but then it introduced an objective exception when it declared that "'the "unreasonable but honest belief" necessary to support the "imperfect right to self-defense manslaughter" cannot be based upon a psychotic delusion.' 261 Kan. at 790." *Roeder*, 300 Kan. at 923. We queried "whether *Ordway* intended for the constraint on subjectivity to apply to others whose belief may have been the product of aberrant mental processes, *e.g.*, brainwashed cult members or religiously indoctrinated terrorists." 300 Kan. at 923.

33

Nevertheless, we rejected *Ordway*'s purported purely subjective interpretation of the imperfect self-defense statutory provisions, opining that

"the purely subjective interpretation does not comport with the statutory language of K.S.A. 21-3403(b). If the legislature had intended to allow a defendant to make up his or her own version of the law based upon the defendant's declaration of an honest belief, the statute could have simply defined the crime as an intentional killing of a human being committed upon an unreasonable but honest belief that circumstances existed that justified deadly force. But the statute adds something; it requires that the honest belief has to be 'that circumstances existed that justified deadly force *under K.S.A. 21-3211, 21-3212 or 21-3213 and amendments thereto*.' (Emphasis added.) K.S.A. 21-3403(b).

"The statutory reference to the perfect defense statutes has to mean something because we do not interpret statutes in such a manner as to render portions superfluous or meaningless. See *State v. Van Hoet*, 277 Kan. 815, 826-27, 89 P.3d 606 (2004) ('The court should avoid interpreting a statute in such a way that part of it becomes surplusage.'). The logical interpretation is that the circumstances which the defendant honestly believed to exist must have been such as would have supported a claim of perfect self-defense or defense-of-others, if true. Accord *People v. Enraca*, 53 Cal. 4th 735, 761, 137 Cal. Rptr. 3d 117, 269 P.3d 543 ('"To make the observation in *In re Christian S.* [, 7 Cal. 4th 768, 773 n.1, 30 Cal. Rptr. 2d 33, 872 P.2d 574 (1994),] more general, not every unreasonable belief will support a claim of imperfect self-defense but only one that, if reasonable, would support a claim of perfect self-defense."'), *cert. denied* 133 S. Ct. 225 (2012)." 300 Kan. at 923-24.

Applying that *Roeder* test here, a lesser included instruction based upon imperfect self-defense was factually appropriate. If Fisher's belief—that Angel possessed military hand-to-hand combat skills with which she could kill him when she initiated a physical attack upon him—had been true, that subjective belief would have reasonably supported a claim of perfect self-defense. But I agree with the majority that Fisher has not carried his burden to show reversal is required under the clearly erroneous standard.

34

With respect to the preliminary instruction telling the jury that "'a mistrial is a tremendous expense and inconvenience to the parties, the Court, and the taxpayers,'" I still firmly believe that "the attempted coercive instruction directs the jurors to consider matters that are beyond the scope of their role in the criminal justice system and the instruction statement is not true in all respects." *State v. Tahah*, 302 Kan. 783, 797, 358 P.3d 819 (2015) (Johnson, J., concurring). Moreover, even the PIK committee has contradicted the notion that the jury should be concerned with the money that might be spent in disposing with the case *after* the trial, to-wit: "Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case is a matter for determination by the Court." PIK Crim. 4th 50.080.

Which is it, then? Does the jury concern itself only with the guilt of the defendant and leave the posttrial disposition of the case for the court to deal with? Or, does the jury concern itself with the tremendous expense and inconvenience to the parties, the Court, and the taxpayers if there is a mistrial? If the latter, does the jury also worry about the tremendous expense and inconvenience caused by a hung jury mistrial that would follow a failure to reach a unanimous verdict? If not, how would a jury intuit that it is only a bad thing to use the taxpayers' money in the event of a misconduct mistrial but acceptable for "'the entire trial process to start over'" when they cannot agree on a verdict? *Tahah*, 302 Kan. at 798. The point is that the pretrial instruction injects a risk of misdirecting the jury, and that risk is unnecessary to accomplish the purpose of dissuading juror misconduct. I would declare it to be error.

Finally, the principal reason I am writing separately is to challenge the majority's declaration that "[a] resident of a house has, as a matter of law, 'an interest' in an interior door of that house sufficient to support another's prosecution for criminal damage to that door." Slip op. at 2, Syl. ¶ 5. The majority's interpretation of the criminal damage statute

35

to support that proposition suffers from the construction flaw of isolating a word or phrase, rather than construing the whole provision. See *State v. Gonzales*, 255 Kan. 243, 249, 874 P.2d 612 (1994) (quoting *Brown v. Keill*, 224 Kan. 195, Syl. ¶ 4, 580 P.2d 867 [1978]) ("'In order to ascertain the legislative intent, courts are not permitted to consider only a certain isolated part or parts of an act but are required to consider and construe together all parts thereof *in pari materia.*'"); *cf. Samantar v. Yousuf*, 560 U.S. 305, 319, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010) ("In sum, '[w]e do not . . . construe statutory phrases in isolation; we read statutes as a whole.' *United States v. Morton*, 467 U.S. 822, 828, 104 S. Ct. 2769, 81 L. Ed. 2d 680 [1984].").

The majority bases its holding on its interpretation of the isolated phrase: "property in which another has an interest." But the whole statutory provision upon which Fisher's prosecution was based, K.S.A. 2015 Supp. 21-5813(a)(1), says more, to-wit:

> "(a) Criminal damage to property is by means other than by fire or explosive:
> (1) Knowingly damaging, destroying, defacing or substantially impairing the use of any property in which another has an interest *without the consent of such other person*; . . ." (Emphasis added.)

Consequently, under the plain language of the statute, the State's evidence that the defendant knowingly damaged property in which another has an interest is insufficient to establish the statutory crime of criminal damage to property, under K.S.A. 2015 Supp. 21-5813(a)(1). The State must also prove that "such other person" did not consent to the act.

For example, a homeowner's roofing contractor, hired to replace shingles on the homeowner's house, could not be convicted of criminal damage to property, even though the State could easily prove that the contractor knowingly damaged "any property in

36

which another has an interest" when the contractor ripped off the homeowner's old shingles. Of course, the contractor's actions do not constitute the crime of criminal damage to property because the absence of consent is an essential element of the crime, and the homeowner's consent to the damaging act as part of the replacement contract negates that element.

As I understand the majority's statutory construction, a nonowner resident/guest in a house has a legally sufficient interest in and to any part of that house, so as to qualify as the victim of a criminal damage to property prosecution under K.S.A. 2015 Supp. 21-5813(a)(1). But reading the statute as a whole, as we must, reveals that the majority's construction of the statute also fails to comply with the "fundamental . . . rule of statutory interpretation that courts are to avoid absurd or unreasonable results." *State v. Frierson*, 298 Kan. 1005, 1013, 319 P.3d 515 (2014).

As K.S.A. 2015 Supp. 21-5813(a)(1) is written—"property in which *another* has an interest without the consent of *such other* person"—the same person whose property interest the State is alleging has been damaged must be the same person whose consent to the damaging act the State must refute. (Emphasis added.) Logically, then, to be a victim of criminal damage to property one must have an interest in that property sufficient to be able to consent to someone "[k]nowingly damaging, destroying, defacing or substantially impairing the use of [that] property." K.S.A. 2015 Supp. 5813(a)(1). Otherwise, the absence of consent portion of the statute is meaningless. See *Frierson*, 298 Kan. at 1013 ("court presumes the legislature does not intend to enact useless or meaningless legislation").

The resulting absurdity of the majority's statutory interpretation can be seen in my roofing contractor example above. Under the majority's holding that a resident of a house has, as a matter of law, a sufficient interest in a part of the house to support another's

prosecution for criminal damage to property, the State could prosecute the roofing contractor by identifying a foreign exchange student living in the homeowner's house as the victim of the crime. Notwithstanding the homeowner's consenting for the contractor to damage the roof as a prelude to replacement, the roofer was "without the consent of such other person," which would have been the foreign exchange student in this example.

To avoid that absurdity in this case, I would have required the State to show that Tim, as the sole owner of house, had invested Angel with a sufficient interest in the interior door so that she could have consented to Fisher damaging that door. Otherwise, she did not have a sufficient interest in the property to be the victim of criminal damage to property under the language of K.S.A. 2015 Supp. 21-5813(a)(1). Such a determination would be a question of fact, not a matter of law, as the majority asserts. Here, there was no evidence presented to establish that Angel's interest in the door complied with the requirements of K.S.A. 2015 Supp. 21-5813(a)(1), and I would reverse that conviction.